JULIE ANN RENNER STEVENS, SPECIAL ADMINISTRATRIX OF THE ESTATE OF SHANE RENNER, DECEASED, APPELLANT, v. GENE KASIK, APPELLEE.

267 N. W. 2d 533

Filed July 12, 1978. No. 41411.

Hutton & Garden, for appellant.

Deutsch, Jewell, Otte, Gatz, Collins & Domina, for appellee.

Heard before SPENCER, McCOWN, CLINTON, and BRODKEY, JJ., and COADY, District Judge.

COADY, District Judge.

This is a wrongful death action by the plaintiff mother of a deceased man against a defendant

farmer, wherein the plaintiff alleged that the proximate cause of the death was the negligence of the defendant because defendant failed to warn the deceased of the danger of entering a grain bin alone while grain is being removed. At jury trial and upon the motion of the defendant, the trial judge directed a verdict against the plaintiff and dismissed her case. She has appealed. We reverse and remand for a new trial.

The deceased grew up on a farm near Madison, Nebraska, where he lived, until his parents were divorced in 1968. At the age of 14, he moved with his brother, sisters, and mother to the City of Madison. There he was graduated from high school in 1972.

The deceased had worked for the defendant during the summer of 1971. The defendant could not recall whether the deceased had helped with the loading or unloading of grain bins. After graduation and during the summer of 1972, the deceased worked for an uncle at the uncle's farming operation near Erickson, Nebraska. That fall he went back to Madison to live with his mother. In the spring of 1973, the deceased again worked for the defendant as a farm laborer, being paid by the day. The mother of the deceased stated she knew he had unloaded grain from farm storage facilities.

The defendant was the owner of a farming operation and was approximately 47 years of age in 1973. He had grown up on his father's farm, was graduated from college, and had worked for his father. He began his own farming operation sometime between 1955 and 1960.

On or about August 2, 1973, the defendant began unloading corn from a quonset on his premises. The deceased helped in that chore, together with the defendant's father, son, brother and nephew. At that time, corn was loaded into four trucks and delivered to grain cars at Enola, Nebraska. On Friday or Saturday, the quonset was cleaned out and the

workers moved to a steel drying bin. Approximately 1,000 bushels of corn were taken from that bin and loaded in three trucks. The loaded corn was not delivered to Enola until the following Monday.

The drying bin, mentioned above, was filled with corn in 1972. The bin was about 26½ feet in diameter and stood 18 feet high as measured from the floor to the top of the sidewalls. Its capacity was approximately 9,000 bushels and it contained approximately 8,000 bushels on the day of the accident.

The drying bin was constructed with a slatted or perforated floor so that heated air could rise and dry grain stored therein. In 1972, the corn would have been harvested at a time when the grain contained moisture in the range of 19 to 30 percent. About 1,500 bushels of high moisture corn were placed in the bin on the first day of the harvest and the heating of the corn began the second day. The drying process was continued until the 9,000 bushels were brought down to 15½ percent moisture.

After the three loads were delivered to the railroad cars on the morning of Monday, August 6, 1973, operations were begun to continue unloading the drying bin. The first three loads had been loaded through the use of a permanent auger which took the corn from the center of the floor of the bin. To unload the bin, the workers simply pulled on a rod which was attached to a small sliding door in the center and on the floor of the bin. The corn did drop through the center of the floor into the permanent auger and move through the auger to a waiting truck. But on the morning of August 6, 1973, only a small amount of corn ran through the permanent auger and into the truck. It was later determined that a weld had broken on the slide door and that the movement of the rod did not slide the door.

The defendant first climbed a ladder on the 18-foot sidewall and entered the bin through an opening at the top of the sidewall. Seeing nothing unusual, he

directed the deceased to get a rod with which the grain could be probed, with the idea of moving whatever was clogging the opening left by the supposedly open sliding door. The deceased, the defendant, and the defendant's brother probed and worked inside the bin without success. The probing rod became stuck and was left standing in the center of the bin. At noon, everyone quit working. The permanent auger was turned off and the parties went to their noon meal.

After lunch, it was decided that the workers would take the drying fan off the bin and enter through a tunnel to determine what the problem was. That did not work. It was decided that a portable, gasoline engine-powered auger would be placed next to a door located on the side and near the bottom of the bin. Panels in the door were opened, the grain flowed into a rubber tire on the ground and was augered up and into the trucks. At this point, the evidence becomes unclear and confusing.

Four trucks were still being used on that afternoon. The defendant, his brother, his father, and his son were driving the trucks. The deceased was around to generally assist in the loading and to handle the auger controls which were near the gas engine on the portable auger. There was no reason for the deceased to go into the drying bin and his presence in the bin would not have assisted the loading of the corn in any way on that particular afternoon. The defendant believes that he hauled three loads from the bin to the railroad cars on that afternoon. It took 15 to 20 minutes to load any one of the four trucks with 260 to 320 bushels. The defendant's brother, father, and son did not testify.

The defendant recalled that he saw the deceased climb the ladder on the sidewall and enter the bin at about 4 o'clock, p.m. He also recalled seeing the head and shoulders of the deceased appearing through the opening in the top of the bin as though

the deceased were coming out. The evidence is not good on the exact timing, but shortly thereafter, the defendant delivered his load of corn to the railroad cars without any conversation with the deceased. Some time later, he returned and began loading his truck. At the same time, he noticed that the deceased was not around and he climbed the sidewall and looked into the grain bin. The defendant then testified "I just know I feared," although there was nothing unusual to be seen in the grain bin.

Later that same day inquiries, as to the whereabouts of the deceased were made of his mother and friends. Some searching was done on the defendant's premises. On the following day, official help was requested and a search of the buildings and premises of the defendant was made. After more corn was removed, the body of the deceased was located near the center and floor of the drying bin.

Absolute safety is unattainable and employers are not insurers. The mere happening of an accident does not create a presumption or justify an inference of negligence. Employers are liable for the consequences, not of danger, but of negligence. Halsey v. Merchants Motor Freight, Inc., 160 Neb. 732, 71 N. W. 2d 311 (1955).

A duty rests on an employer to warn his employees of dangers not apparent which may arise in the course of the employment, which the employer knows or ought to know about, and which he has reason to believe the employee does not know and will not discover in time to protect himself. Russo v. Swift & Co., 136 Neb. 406, 286 N. W. 291 (1939); Anstine v. Briggs, 191 Neb. 489, 215 N. W. 2d 878 (1974).

An employee is chargeable with contributory negligence where he fails to take due care to avoid defects and dangers which are so open and obvious that anyone in the exercise of ordinary care and prudence would discover them. Where an employee has knowledge of the dangers to which the service

exposes him or where the defects or dangers are so patent and obvious that in the exercise of ordinary care, in the performance of the services for which he was employed, he should have known of their existence, he assumes the risk of injury incident thereto. Ring v. Kruse, 158 Neb. 1, 62 N. W. 2d 279 (1954).

The party against whom a motion for a directed verdict is directed is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence. It is only when the facts are conceded, undisputed, or are such that reasonable minds can draw but one conclusion therefrom that the trial court must decide the question as a matter of law and not submit it to a jury. Fangmeyer v. Reinwald, 200 Neb. 120, 263 N. W. 2d 428 (1978); Garcia v. Howard, 200 Neb. 57, 262 N. W. 2d 190 (1978).

Upon consideration of this record, we find that reasonable minds might decide that the defendant knew of the danger of suffocation, that the circumstances called the danger to his attention, that it appeared to him the deceased did not know of the danger and was exposing himself to an unapparent danger, and that a reasonable man in like circumstances would have warned the deceased. Under these rules of law, we are not required to find that such findings are likely rather than reasonable. However, reasonable minds are likely to interpret defendant's actual testimony to be an admission of his awareness of the danger.

As to whether the deceased was negligent or did assume the risk of the danger, the answer is less debatable. It should be pointed out that there is no evidence the deceased had ever unloaded a like bin. The quonset was described as flat storage and unlike the drying bin. The mother's mere conclusion that the son had unloaded grain from farm storage facilities is very general and may have been made without factual basis. In any case, we find that the facts

and the favorable inferences springing therefrom require submission to a jury.

REVERSED AND REMANDED FOR A NEW TRIAL.