KIRBY (JOE) GROTE AND CONNIE GROTE, HUSBAND AND WIFE, AS PARENTS AND NATURAL GUARDIANS OF CORY GROTE, A MINOR, APPELLEES AND CROSS-APPELLANTS, V. MEYERS LAND AND CATTLE CO., A CORPORATION, APPELLANT AND CROSS-APPELLEE.

485 N.W.2d 748

Filed July 2, 1992.   No. S-89-766.

960

Thomas J. Culhane and Gary L. Hoffman, of Erickson & Sederstrom, P.C., and Marvin O. Kieckhafer, of Kay & Kay, for appellant.

Robert G. Pahlke, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Meyers Land and Cattle Co. (Meyers), a Nebraska corporation doing business in Sheridan County, Nebraska, appeals a $250,000 jury verdict in favor of 16-year-old Cory Grote and his parents as a result of Cory's receiving head injuries when a weanling colt owned by Meyers kicked him.

## I. CLAIMED ERRORS

On appeal, Meyers claims the trial court erred in (1) refusing to grant its motion for a directed verdict, (2) refusing to instruct the jury on Meyers' affirmative defenses of contributory negligence and assumption of the risk, (3) giving a certain instruction to the jury, (4) refusing to grant Meyers a new trial, and (5) responding to a question of the jury's during its deliberation in the absence of counsel, and Meyers also claims that (6) the verdict and judgment are not supported by the evidence and are contrary to law.

There being no merit to any of the cattle company's assignments of error, we affirm the judgment of the district court for Dawes County.

In an appeal of an action at law, an appellate court does not reweigh the evidence; rather, the court considers the evidence in the light most favorable to the successful party, with conflicts resolved in favor of the successful party, who is entitled to the benefit of every inference which can reasonably be deduced from the evidence. *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991).

## II. THE FACTS

Considering the evidence in the light most favorable to the plaintiffs, the evidence reflects that in December 1987, Cory, who was 16 years old, was visiting his brother, Brad Grote, who was employed as a ranch hand at the Joy Ranch, a division of Meyers. Both Cory and Brad had considerable experience with

horses and had participated in local and national rodeo competitions. At Cory's request, Brad had sought and received permission from Bruce Bushnell, Meyers' ranch foreman, for Cory to visit Brad at the ranch. Bushnell was aware that Cory planned to work while at the ranch to earn money during his Christmas vacation.

On December 23, the day after Cory's arrival at the ranch, the two brothers spent the day in the ranch shop building gates, cutting metal, and welding. Late in the afternoon, Brad requested Cory's assistance in releasing 12 weanling colts from a barn into an adjacent corral. A weanling colt is a colt that has recently been weaned from its mother. See Webster's Third New International Dictionary, Unabridged 2589 (1981).

Cory testified that in handling the colts he followed Brad's instructions to "just lead them out of the barn door a little ways, stop them, make them face you, pet them a little bit and drop the lead rope and turn and walk away." No difficulty was encountered in releasing 11 of the colts. As the brothers were preparing to release the last weanling colt, a buckskin colt, Brad stopped to speak to another ranch employee, Maggie Soester, who had arrived at the barn. Cory testified that as he approached the 12th colt's stall, the colt was "prancy in his stall. He was stomping and stepping." Cory untied the colt. It began tugging on the lead rope as it started out of its stall. Cory testified:

> Brad said, "don't let him get away. . . ."
>
> . . . .
>
> . . . And [the colt] was jerking me down the alleyway. I was on my feet, I didn't feel like I was in any trouble. Near the barn door . . . Brad said, "Now, don't let him get away." And I don't really know what happened after that until Brad asked me if I was kicked, or if he got me, or something like that.

Cory testified that while he was alongside the colt and as long as he could remember he did not think he was in any danger of getting kicked.

Soester testified that Cory had good control of the colt until he got outside the barn. She said that Cory was on his feet at all times, although he was sliding in the snow as he was heading

into the corral while trying to hang onto the colt. She said that the only sudden movement the colt made was a turn at the end of the corral and that the colt's kick came a "scant second" after the turn. Soester testified that there was no opportunity for Cory to react and that before the colt's sudden movement she saw no risk of Cory's being kicked because he had control of the horse.

Brad testified that he was not looking at Cory at the instant Cory was kicked. Brad heard a "crack," and he then saw Cory on his knees. Cory suffered a depressed skull fracture and nearly complete loss of vision in his left eye. He suffered permanent brain damage. A "plate" was surgically inserted on the left side of Cory's skull to protect his brain where a portion of his skull had been removed.

### III. THE PLEADINGS

In their petition and amendments thereto, Kirby (Joe) and Connie Grote, as parents and natural guardians of Cory, alleged that Meyers and its employees were negligent in one or more of the following particulars: (1) failing to provide a reasonably safe place in which to work, (2) failing to warn of the horse's dangerous habits, (3) failing to properly supervise and instruct Cory, (4) failing to assist and aid Cory in handling the horse when defendant knew or should have known of the horse's dangerous habits, (5) failing to provide adequate instruction and supervision for defendant's employee who had the responsibility of supervising Cory, (6) allowing Cory to handle a horse with known dangerous tendencies and/or habits, and (7) failing to use or instruct in the use of reasonable alternatives in releasing the dangerous horse from the stall. The Grotes allege that as a result of that negligence Cory was injured.

In its answer, Meyers admitted that Cory was injured in an accident involving a horse on or about December 23, 1987. Meyers alleged that Cory was contributorily negligent in failing to (1) maintain a proper lookout and (2) take proper precautions for his own safety when he knew or should have known that he was in a position of peril. The cattle company also alleged that (1) if it was negligent, Cory was contributorily

negligent in a degree more than slight as a matter of law, and that (2) Cory had assumed the risk of his injury.

## IV. ADDITIONAL FACTS

Although not allowed to testify whether Cory was hired as an employee, Bushnell did testify that he knew Cory wanted to earn money at the ranch and that he had had no objection to Cory's working with Brad in the shop and helping with the horses.

According to Bushnell, all the hired hands who worked with the weanling colts were instructed in the importance of thwarting escape of those animals. He explained that weanling colts, when separated from their mothers, become nervous and try to get back to their mothers and that it is important to prevent escape attempts from becoming a habit. Bushnell stated that Brad had been instructed two or three times to not let the horses get away.

Bushnell testified the colt that kicked Cory had attempted to escape from Bushnell on other occasions and succeeded in escaping once or twice. The offending colt had previously escaped one time from Brad and had attempted to escape from him on several other occasions. Bushnell testified that it was "predictable" that the colt that injured Cory would try to escape. He testified that, nonetheless, no warning was given to Cory about the history of the colt that injured Cory. Bushnell said that Brad should have warned Cory about the colt, and, given that Brad was bigger, more experienced, and had superior knowledge of the colt's habits, Brad, rather than Cory, should have taken the colt out of the barn. Bushnell at one point testified that he had not taken any precautions to protect those working with the colts, but that he should have done so.

Brad testified that Cory had no experience with weanling colts. He also testified that the colt that injured Cory had escaped from Brad previously and that he had forgotten to warn Cory. Brad said that there were reasonable steps which he could have taken to prevent the accident, including taking the horse out himself or helping Cory to do so. Cory and his mother also testified that Cory had no experience with weanling colts.

It was the uncontroverted testimony of Charlie Hill, Jr., a

professional horse trainer experienced in dealing with problem horses, that "this horse [the colt that injured Cory] was a hazard and dangerous horse" because of its prior attempts at escape. He declared that "[t]his horse is a horse of flight, so it would be flight or fight." He explained that

> [t]he horse's first natural instincts are to flee, that is what they are born with, and if that doesn't work, if he doesn't think he has time to flee, if he doesn't think he has room to flee, or if it is hard for him to flee, then he prepares to kick, strike, bite, or attack.

It was Hill's opinion, based on reasonable probability within his field of expertise, that there were "several options that should have been available that would have offered reasonable and prudent care on the part of the Defendant that would have, in fact, eliminated that accident." Among the available options cited by Hill were to have (1) had Brad release the colt himself, (2) warned Cory of the dangers of the colt and its habits, (3) had Brad assist Cory in releasing the colt, (4) used the chain attached to the barn door to better control the horse, or (5) used a 50- or 60-foot rope so that the horse could be controlled from a safe distance. According to Hill, the cost to the ranch of these available options was "[t]he price of a 60 foot rope."

Hill, who had 35 years' experience in instructing youngsters in handling problem horses, testified that Cory's action was reasonable because

> [t]he first thing that he did was follow the instructions of his superiors, and at that time that he was following the instructions of his supervisors he felt no immediate hazard. There might have been a little hazard, but there was no immediate hazard. At the moment that the hazard became immediate after the instructions were given, and after Cory had gone that far, then whatever situation he got in from there was a fight for survival on his part.

Hill also testified that had Cory not hung onto the rope as he did, the buckskin colt could have kicked with its full strength, which could have resulted in Cory's death. On appeal, there is no assignment of error regarding this testimony.

## V. RULINGS ON MOTIONS

At the close of the plaintiffs' evidence, the trial court denied Meyers' motion for a directed verdict in its favor. This motion was renewed at the close of the cattle company's evidence, and was again denied. At the conclusion of Meyers' evidence, the Grotes moved for a directed verdict in the Grotes' favor on the issues of liability, contributory negligence, and assumption of the risk. The court refused to grant the Grotes' motion for directed verdict in their favor on the issue of liability, but granted the Grotes' motion and, thus, removed from the jury Meyers' claims that Cory was guilty of contributory negligence and assumption of the risk of injury.

## VI. THE JURY'S QUESTION

When the jury asked the trial judge during its deliberations whether it had been established that the colt that injured Cory had dangerous propensities, the trial judge responded in writing that that was for the jury to decide. Counsel for both parties had waived the right to be present during jury deliberations.

## VII. THE VERDICT

Upon completion of its deliberations, the jury returned a verdict against Meyers and in favor of the plaintiffs for $250,000. The cattle company's motion for a new trial was overruled.

## VIII. ANALYSIS OF CLAIMED ERRORS

In analyzing Meyers' assignments of error, we start with the premise that the elements of a negligence action are duty, breach, proximate cause, and damages. See *McVaney v. Baird, Holm, McEachen*, 237 Neb. 451, 466 N.W.2d 499 (1991). In their petition, the Grotes alleged that Cory was injured while acting in the scope of his employment with Meyers. Meyers denied the employment allegation, and that issue was not submitted to the jury. Ranch hands are not covered under Nebraska's Workers' Compensation Act. Neb. Rev. Stat. § 48-106 (Reissue 1988). In any event, the duty of care owed to Cory by Meyers at the time Cory was injured was essentially the same whether he is deemed to have been an employee or an invitee of Meyers. This court has held that a duty rests on an

employer to warn his employees of dangers not apparent which may arise in the course of the employment, which the employer knows or ought to know about, and which he has reason to believe the employee does not know and will not discover in time to protect himself. *Stevens v. Kasik*, 201 Neb. 338, 267 N.W.2d 533 (1978). Similarly, a possessor of land may be subject to liability for physical harm caused to invitees on its land if the possessor knows that a condition involves an unreasonable risk of harm, the possessor should expect that the invitees will not discover the danger or protect themselves against it, and the possessor fails to exercise reasonable care to protect against such danger. *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991).

The evidence in the present case reflects that at the time Cory was injured, there was a risk involved in his handling weanling colts of which the defendant cattle company knew or should have known. At least one of Meyers' employees knew that Cory had no experience, training, or knowledge of how to handle the colts. This knowledge is imputable to Meyers. There was sufficient evidence for a jury to conclude that Meyers failed to exercise reasonable care to protect Cory against the dangerousness of weanling colts, whatever Cory's capacity while he was on Meyers' ranch.

## 1. Directed Verdict Motion

Despite uncontroverted evidence that Cory had no experience with weanling colts, which, according to the evidence, are by nature more temperamental than horses generally, Meyers argues that it was unnecessary to instruct, warn, or supervise one with Cory's background with horses. Meyers, therefore, assigns as error the failure of the trial court to grant its motion for a directed verdict.

"In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. . . . In considering the evidence for the purpose of a motion for directed verdict, the party against whom a motion is made is entitled to have the benefit of every inference which can reasonably

> be drawn from the evidence. If there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. . . ."

*Baker v. St. Paul Fire & Marine Ins. Co., ante* p. 14, 17, 480 N.W.2d 192, 196 (1992). In a negligence case, a trial court should sustain a motion for directed verdict only when the evidence, viewed in the light most favorable to the party against whom the motion is directed, fails to establish actionable negligence. *Patterson v. Swarr, May, Smith & Anderson*, 238 Neb. 911, 473 N.W.2d 94 (1991).

The evidence reflects that Meyers, through its employees Bushnell and Brad Grote, knew of the habits and propensities of weanling colts in general, and of the buckskin weanling colt in particular. All Meyers' hired hands were instructed by Bushnell concerning prevention of escapes by the weanling colts. The colt that kicked Cory had attempted to escape several times and had been successful in escaping on at least one occasion each from both Bushnell and Brad.

Cory was never given any of this information. Brad testified that he simply forgot to warn Cory of the colt's propensity to escape. As an employee of Meyers', Brad knew that Cory was not aware of the danger posed by weanling colts. Bushnell testified that Brad should have warned Cory of the colt's proclivity toward escaping. Bushnell also stated that under the circumstances, Brad, not Cory, should have released the colt. Instead of releasing the colt himself, Brad merely instructed Cory to release it.

> The law imputes to the principal or master responsibility for the negligent acts of his or her agent or servant done in obedience to the express order or directions of the master, or within the scope of the employee's authority or employment in the master's business, and if those acts cause injury to third persons, the law holds the principal or master liable therefor.

*Plock v. Crossroads Joint Venture*, 239 Neb. 211, 219, 475 N.W.2d 105, 112 (1991). The trial court committed no error in refusing to direct a verdict in Meyers' favor (1) because the Grotes adduced evidence from which a jury could conclude that the weanling colt that injured Cory had dangerous propensities,

that Meyers' employees, and therefore Meyers, knew of these dangerous propensities, and that Meyers, through its employee, knew that Cory had no knowledge of the dangerousness of weanling colts or experience with them; (2) because there was sufficient evidence from which a jury could conclude that Meyers and its employees were negligent in one or more of the particulars alleged in the plaintiff's petition, as amended; (3) because there was no competent evidence of any contributory negligence on Cory's part; and (4) because, as will be discussed later, the doctrine of assumption of risk could not apply under the facts of this case.

## 2. AFFIRMATIVE DEFENSES

### (a) Contributory Negligence

Meyers also objects to the refusal of the trial court to instruct the jury on the affirmative defenses of contributory negligence and assumption of the risk.

> Contributory negligence is conduct on the part of the plaintiff amounting to a breach of the duty which the law imposes upon persons to protect themselves from injury and which, concurring and cooperating with actionable negligence on the part of the defendant, contributes to the injury complained of as a proximate cause.

*City of LaVista v. Andersen, ante* p. 3, 7-8, 480 N.W.2d 185, 189 (1992).

Meyers' claim of affirmative defenses is based upon the testimony of both Cory and Brad that the offending colt was acting skittish and frightened when Cory first approached it. However, both Cory and Soester testified that Cory was in no apparent danger until he was actually kicked. Soester testified that Cory had the colt under control at all times and that it was just a "scant second" between the time the colt made a sudden movement and its kick that injured Cory. Hill testified that Cory's action was reasonable and that from the moment Cory realized that he was in danger, he was in a fight for survival. None of this testimony was disputed by the defendant cattle company.

The evidence reflects that Cory confined his conduct in regard to the colt that injured him strictly in accordance with

instructions given him by Meyers' employee. Because of his lack of knowledge and experience with weanling colts, it cannot be said that Cory should have disregarded those instructions. Meyers, through its employee, having instructed Cory how to handle weanling colts, and Cory having followed those instructions, is in no position to argue that Cory was contributorily negligent in handling the colt that injured him.

When contributory negligence is pleaded as a defense, and there is no competent evidence to support it, it is prejudicial error to submit to the jury issues involving contributory and comparative negligence. *Center State Bank v. Dana, Larson, Roubal & Assoc.*, 226 Neb. 408, 411 N.W.2d 635 (1987). Because there was no competent evidence that Cory breached his duty to protect himself from injury, the trial court was correct in refusing to instruct the jury on the issue of contributory negligence.

### (b) Assumption of Risk

"Before the defense of assumption of risk is submissible to a jury, evidence must show that the plaintiff (1) knew of the danger, (2) understood the danger, and (3) voluntarily exposed himself or herself to the danger which proximately caused the plaintiff's damage. [Citations omitted.] '[E]xcept where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character, or the danger involved, including the magnitude thereof, and voluntarily accepts the risk.' [Citation omitted.]"
*Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 302, 470 N.W.2d 724, 732 (1991).

Meyers claims that because Cory was an experienced horseman and high school rodeo champion who had been raised around horses, he must be deemed to know that horses will bolt and sometimes kick unpredictably. In addition, Meyers argues that Cory was aware the colt was acting skittish and that, thus, he appreciated the danger that he might be kicked by the colt.

The record is clear, however, that Cory's background with

horses did not include experience with weanling colts. The evidence is overwhelming that Cory was not warned of the offending colt's proclivity to escape. As explained by Hill, the colt was a "horse of flight" which would "kick, strike, bite, or attack" if there was an attempt to curb its natural instinct to flee. Unaware and unwarned of these traits in the colt that injured him, Cory cannot be said to have known of, nor understood, the danger in handling the buckskin colt. Nor can it be said that Cory voluntarily exposed himself to a danger of which he was not aware and of which he was not informed.

The trial court was correct in directing a verdict against Meyers on its affirmative defenses.

### 3. JURY INSTRUCTIONS

In its second assignment of error, Meyers claims the trial court erred in failing to give its proposed instructions Nos. 13 and 14 to the jury. Proposed instruction No. 13 provided:

There are many characteristics common to all horses, even the most gentle. One such characteristic is their propensity to rear or bolt when frightened. It is one of the situations that one handling a horse must expect to encounter and one handling a horse must take the risks incident to such pursuit. [Citations omitted.]

Proposed instruction No. 14 provided: "A domesticated animal, such as a horse, is presumed not to be dangerous or vicious. In order to hold the owner of the horse liable for negligence, it must be shown that the horse was dangerous or vicious and that the owner knew it. [Citations omitted.]"

In substance, the defendant's proposed instruction No. 13 would have told the jury that Cory had assumed the risk of his injury. The evidence does not justify such an instruction. As stated in *Sikyta v. Arrow Stage Lines, supra*, before the defense of assumption of risk is submissible to a jury, the evidence must show, among other things, that the plaintiff (1) knew of the danger and (2) understood it. Evidence that Cory knew of the danger is totally lacking from both the plaintiffs' and the defendant's evidence. Nor is there any evidence that Cory understood that there was a danger in releasing a weanling colt. As a matter of fact, although the defendant's employees were

aware of the dangerous propensities of the buckskin weanling colt that injured Cory, they did not advise him of that danger. In handling the colt, Cory did precisely what the defendant's employee instructed him to do. There was no warning of any danger to Cory. Moreover, Cory had never had any experience with weanling colts or their propensities.

Through its proposed instruction No. 14, Meyers basically is claiming that it should be presumed that its weanling buckskin colt that injured Cory was not dangerous or vicious and, inferentially, that if it was dangerous or vicious, Meyers had no knowledge of either of these propensities. The testimony of the Grotes' expert witness and of Meyers' ranch foreman render the proposed instruction inapplicable to the facts in this case. The testimony of plaintiffs' expert witness that the weanling colt that injured Cory was "a hazard and dangerous horse" was uncontroverted. Moreover, Meyers' ranch foreman, who had 30 to 40 years of experience with horses, testified that weanling colts, when separated from their mothers, become nervous and try to get back to their mothers. The ranch foreman testified that it is important to prevent weanling colts from making a habit of attempting to escape. The weanling colt that injured Cory had succeeded in escaping once or twice from the ranch foreman and had attempted to escape on other occasions. The foreman testified that the colt had also escaped from Brad Grote on one occasion. Meyers' foreman further testified that he knew that a horse that tries to escape can injure someone by kicking. This testimony was also uncontroverted. A defendant corporation, as an employer and principal, is bound by the knowledge possessed by its employees, in this case, its ranch foreman and Brad Grote. See *Nichols v. Ach*, 233 Neb. 634, 447 N.W.2d 220 (1989). Even though the defendant knew that its colt could injure its handler, it never informed Cory of the colt's propensities. Thus, the defendant's proposed instruction No. 14 is not applicable to the facts in this case. It is not error for a trial court to refuse a requested instruction if the legal principles therein announced are either incorrectly stated *or are inapplicable* to the issues involved.

In order to establish as error the trial court's refusal to give a requested instruction, an appellant is under a threefold

burden to show that he or she was prejudiced by the court's refusal, that the tendered instruction is a correct statement of the law, and that the instruction is applicable to the evidence in the case.

*McClymont v. Morgan*, 238 Neb. 390, 393, 470 N.W.2d 768, 771 (1991).

All the jury instructions given must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. *Id.*

Because the jury instructions as a whole correctly stated the law, adequately covered the submissible issues, and were not misleading, there was no prejudicial error on the part of the trial court in refusing to give Meyers' proposed instructions Nos. 13 and 14.

In its third assignment of error, Meyers objects to the court's instruction No. 2, claiming that the court simply copied the allegations of negligence contained in plaintiffs' amended petition. The record does not reflect that any such objection was raised at trial. Ordinarily, an objection must be made as soon as the applicability of it is known, or could reasonably have been known, to the opponent. *Bloomquist v. ConAgra, Inc., ante* p. 135, 481 N.W.2d 156 (1992). Thus, Meyers' objection to the trial court's instruction No. 2 is not before us.

### 4. MOTION FOR NEW TRIAL

In its fourth assigned error, Meyers claims the trial court erred in failing to grant it a new trial. This issue was not discussed in Meyers' brief on appeal. Errors which are assigned but not argued will not be considered by an appellate court. *In re Interest of A.C.*, 239 Neb. 734, 478 N.W.2d 1 (1991).

### 5. JURY'S QUESTION

In its fifth assigned error, Meyers claims the trial court erred in receiving and answering, outside the presence of counsel, a question from the jury. The record demonstrates that immediately after the jury retired to deliberate, the following exchange took place between the court and counsel for the parties:

THE COURT: . . . . If you want to be present during the time that the jury is out or when the verdict comes in you will have to leave a phone number of where you will be, and where the Bailiff or clerk can call you. Does anybody want to waive being here?

[Meyers' counsel]: Yes.

. . . .

THE COURT: You have a right to have input into any further instructions that I might give them.

[Meyers' counsel]: Well, I am going home.

Having waived the right to be present during jury deliberations, Meyers cannot be heard on appeal to complain of the consequences of its action. More importantly, there has been no showing that the communication between the court and the jury was prejudicial. If it clearly appears that prejudice did not and could not flow from such a communication outside the presence of counsel, it is error without prejudice and not ground for reversal. *In re Estate of Corbett*, 211 Neb. 335, 318 N.W.2d 720 (1982). There is no merit to this assignment of error.

### 6. SUFFICIENCY OF EVIDENCE

Finally, Meyers claims that the verdict and judgment are not supported by the evidence and are contrary to law. This claimed error is without merit. There was substantial evidence from which a jury could find that Cory's injuries were directly and proximately caused by the negligence of the cattle company. Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Baker v. St. Paul Fire & Marine Ins. Co., ante* p. 14, 480 N.W.2d 192 (1992). In our independent judgment, as a matter of law, there was sufficient evidence to support the jury's verdict.

Because we affirm the judgment of the trial court, the Grotes' assignments of error on their cross-appeal need not be addressed.

AFFIRMED.