JIMMY DEAN HAWKINS, APPELLANT, V. DANIEL KANE, APPELLEE.
582 N.W. 2d 620

Filed June 23, 1998.    No. A-97-200.

Douglas J. Stratton, of Stratton & Ptak, P.C., for appellant.

Todd B. Vetter, of Gatz & Fitzgerald, for appellee.

HANNON, IRWIN, and INBODY, Judges.

HANNON, Judge.

Jimmy Dean Hawkins brought a negligence action against his employer, Daniel Kane, after Hawkins' foot was impaled by a piece of farm equipment while Hawkins was in Kane's employ. The district court granted Kane's motion for summary judgment and dismissed Hawkins' negligence action. Because we find there are genuine issues of material fact, we reverse.

## UNDISPUTED FACTS

On September 10, 1994, Hawkins, then 31 years of age, was in the employ of Kane as a farm and ranch hand, helping Kane build a corral. When their efforts at digging postholes by hand became difficult, Kane borrowed a tractor and a posthole digger, which is basically an auger powered by the tractor, from his neighbor and fellow farmer, Gail Anderson. Kane operated the tractor while Hawkins lined up the posthole digger over the designated areas. After digging at least three or four holes with the posthole digger, they came to a spot of land where the ground was hard and the digger would not go into the ground to the proper depth. On his own volition, but with Kane looking on, Hawkins stepped up onto the top of the digger, more specifically the auger gearbox, to provide extra downward force on the digger. At some point shortly thereafter, the digger "sprang" back into its original upright position and a metal bar which locks the auger and holds it in place when not in use impaled Hawkins' foot. Two of Hawkins' toes had to be amputated as a result of the accident.

## PROCEDURAL HISTORY

Thereafter, Hawkins brought a negligence action against Kane, alleging, in the relevant petition, that Kane had failed to warn him of the dangers of standing on top of the posthole digger. Hawkins specifically alleged that the incident was caused by Kane's failure to maintain a safe work environment, failure to instruct Hawkins on the proper use and safety precautions of

the posthole digger, failure to properly supervise him, and failure to warn him of the dangers of standing on top of the posthole digger. Hawkins alleged that Kane knew or should have known that the posthole digger would not operate properly in hard ground and that Kane knew or should have known about the dangers of operating the posthole digger. Hawkins prayed for special damages in the amount of $17,332.41, general damages, and costs. Kane filed a general denial and affirmatively alleged defenses of contributory negligence and assumption of risk. Each party filed a motion for summary judgment.

## SUMMARY JUDGMENT

At the hearing on the parties' motions, Kane offered six exhibits into evidence: (1) an affidavit of Anderson, the farmer who owned the tractor and posthole digger; (2) an affidavit of Ronald Ringer, Anderson's hired man; (3) the deposition of Hawkins; (4) the deposition of Kane; and (5) and (6) the pleadings. The bill of exceptions contains contradictory testimony, as set forth below, as to the mode of operation of the posthole digger. Additionally, the parties' descriptions of the accident are hazy, at best. For these reasons, much of the testimony is provided verbatim.

### Description of Posthole Digger.

The affidavits of Anderson and Ringer, which are nearly identical, describe the posthole digger as being composed of two major components: (1) the auger unit which digs the posthole and (2) the cage or frame, which holds the auger unit in place when it is not engaged. The posthole digger is connected to the power take-off (PTO) unit of an IHC 656 tractor. Hydraulic controls on the tractor operate the PTO, which engages the digging motion of the auger and lifts the cage or frame unit of the digger. However, "[t]he hydraulic controls do not lift the auger unit of the posthole digger while it is engaged." According to Anderson and Ringer,

> [t]he auger unit of the posthole digger is pulled into the ground as it digs. The auger unit cannot be lifted or manipulated during the digging process by use of the controls on the tractor. The auger unit is lifted out of the ground when

the digging process is completed by tripping a lever on the auger unit.

Anderson's affidavit reveals that he purchased the posthole digger in the 1960's and that he has frequently used it as part of his business. According to Anderson and Ringer, both the tractor and the posthole digger were in good operating condition and were not defective on the date of the accident. Both Anderson and Ringer also stated that they had personally used the posthole digger while digging holes in hard soil and that they had never experienced an instance when the auger unit of the posthole digger had "popped up" or lifted itself out of a hole without the lever on the auger unit's having been manually tripped. The affidavits also reflect that while Anderson did not provide instructions to Kane as to how to use the posthole digger, Ringer did show Kane the hydraulic controls on the tractor and the trip lever on the auger.

Attached to Anderson's affidavit was a photograph of the posthole digger, which he stated fairly and accurately portrayed the equipment. The photograph, which is apparently taken from the front side at a position approximately where the left rear wheel of the tractor would be located if the digger was so attached, shows at least some of the ironwork which would attach to the tractor, the PTO rod that is attached to what must be the auger gearbox, the auger blade positioned downward from the gearbox, and pipe-shaped rods which are parallel to, but a short distance from, the auger blade. On the photograph, Anderson circled "the trip lever or mechanism which is the sole lever or device which allows the auger unit to spring back into a locked position after it has dug a hole to the appropriate depth." Although the photograph provides only a side view of the gearbox, the lever appears on the front right-hand surface thereof. We are given no explanation as to the function or mode of operation of any of the parts. The photograph does not clearly demonstrate the working configuration of the posthole digger, and we hesitate to supply a more detailed description which might inadvertently consist of some information not contained in the record.

A fair summary of the testimony of Anderson and Ringer is that when the auger is engaged, it can be lifted out of the ground

only by tripping the lever on the auger gearbox and not by using any of the tractor's controls, namely the three-point hitch. This contradicts the testimony of Hawkins and, for that matter, that of Kane as well, as to how the posthole digger operates.

In his deposition, Hawkins testified that at the time of the accident he had 20 to 21 years of experience running farm equipment, which included posthole diggers, and further that in the past he had stood on top of such diggers while they were operating in order to provide extra weight when they were digging through hard ground. However, Hawkins testified that he had never used a posthole digger similar to that which he and Kane were using on the day of the accident. Hawkins explained that the posthole diggers that he had previously used moved the augers up and down through the use of the tractor's three-point hitch.

With respect to this particular posthole digger, Hawkins testified that "[i]t ran off the three point on the tractor of the PTO and it had a lever on it that you tripped it and it went down and dug itself into the ground." Hawkins further testified that both the PTO and the three-point levers were on the tractor, that the tripping mechanism was "[o]n the digger on the gear box," and that the tripping lever was not something that could have been reached from sitting on the tractor. Concerning the digging process, Hawkins testified as follows:

> Q And you would then, when you got the tractor in the correct position and the posthole digger lined up, you would trip it?
> A Yes.
> Q And is this kind of like a gravity type thing, once you trip it the auger will fall to the ground—
> A Yes.
> Q —and then the blades will dig into the ground and pull itself down?
> A Yes.
> Q Is that how it worked?
> A Yeah.

We observe that in this context "it" appears to refer to the tripping lever on the auger gearbox.

More important, Hawkins testified as follows with regard to the raising of the posthole digger. When asked how the auger was to be raised out of the ground, Hawkins testified, "You'd have to reach over and pull the three point lever up." Hawkins testified that Kane would have to do that, presumably, we infer, from the tractor. Hawkins continued:

Q . . . Was there any type of mechanism on the auger itself that you could have tripped to raise it up?

A No.

Q So when the machine would come up, that would be [Kane's] doing?

A Yes.

Q And what he would— as I understand, you're saying he would raise the three point and it would raise the whole unit up?

A Yes.

. . . .

Q Now on the previous holes when the machine— when the auger would be lifted up out of the ground, was there a locking device on it where you had to trip it each time?

A Yes.

Q Did you understand how that particular aspect of the machine worked?

A Yes, I did.

Q Okay. And do you know if— did the auger raise up and get locked into place by the three point or was it spring-loaded that brought it up?

A I can't remember. I think the three point brought it up.

Q Okay. And you were aware of— please describe for me what you understood to be the locking device.

A Just a piece of iron with a hook in it and it locked into the gear box.

Q On the auger?

A On— yeah, on the gear box, the auger.

Q Okay. And this hook that you described, did it come down from the arms of the auger?

A No, it came down from the cage.

. . . .

Q Okay. Well, did you understand that the auger would raise up and get locked by that metal bar passing into the auger?

A Yes, I did.

Q Okay. And so you understood that the auger would come up, the metal bar would pass into the auger and eventually get locked into place?

A Yes, I did, with the raising of the three point.

Thus, we interpret Hawkins' testimony concerning the operation of the posthole digger to mean that only by use of the three-point hitch could the auger be raised out of the ground. This testimony, of course, differs from that of Anderson and Ringer, who stated that the auger could be raised only by tripping the lever on the auger.

Kane's testimony is fairly consistent with Hawkins' testimony. Kane, who testified that he "may have" used a posthole digger similar to this type before, testified that Ringer had showed the "levers" and "basic functions" to him. Concerning the operation of the posthole digger, Kane testified:

[Hawkins] stood by the hole where it's supposed to be dug and I backed up the tractor and he made sure that I got it over this right spot and then I tripped it and turned the PTO on and he tripped it from back behind and we dug the hole and then I'd pull it up and then go to the next one and—

. . . .

. . . And the posthole digger was hooked onto the three point hitch so the man controlling the tractor could move the— move the three point hitch up and down and carry the posthole digger—

Q Okay.

A —from one hole to the next.

Kane also testified that the auger blade was approximately 4 feet in height and that the whole unit was 5 to 5½ feet in height. Kane testified that the man on the tractor turned on the PTO and "[t]hat turned the auger. The auger is spinning free. The man behind would trip it and release the auger and it hit the ground and then dug itself in— in a hole."

*Accident.*

According to Hawkins, because he and Kane "weren't getting any place" digging holes by hand, Kane went over and borrowed Anderson's posthole digger. Hawkins testified that upon Kane's return, Kane "explained how to release it and let it go down in the ground." According to Hawkins, Kane told him about "[j]ust a lever on there you had to trip so it'd release and go down to the ground." While Kane ran the tractor, Hawkins lined up the posthole digger and tripped the lever on the auger, causing the auger blade to fall to the ground.

Hawkins' testimony additionally reflects that the posthole digger dug at least three or four holes without any problems. When it experienced difficulties on the next hole, Kane "just raised it up and sat it back down again and it went down again." We observe that there is no testimony as to what "it" was, specifically whether it was the entire digger or just the auger blade, but we presume from his earlier testimony that "it" was the entire digger. They then proceeded to the next hole. Hawkins described the ensuing events as follows:

> We lined it up, started digging and it went down a ways and wouldn't go down. [Kane] raised it up and put it back down, it still wouldn't get down and I said something to [Kane] or motioned to [Kane] that I was going to climb up on top of it and he seemed to be okay with it and I got up on top of it and the next thing I knew, it sprang back up and caught my foot.

Again, there was no testimony as to what "it" was that sprang back up. We interpret this testimony to mean that Kane would have had to initiate the movement of the auger from the tractor seat, notwithstanding the statements by Anderson and Ringer that the hydraulic controls did not lift the auger unit of the posthole digger while it was engaged. Perhaps these affidavits are not intended to be concerned with how the auger is raised during the digging process. However, Hawkins essentially testified that if the digger came up it would be Kane's doing. This is clearly an issue of fact, and our only concern is whether it is a material fact.

Hawkins testified that the auger was "a couple foot" into the ground when he decided to climb on it and that he had to step

up 2 to 2½ feet onto the gearbox. Hawkins did not know if he placed his foot over the top of the hole where the locking bar went into the auger gearbox and did not look to see if he was stepping over the hole. Hawkins, who testified that he was facing toward the tractor and was able to see Kane when standing on the gearbox, did not notice Kane do anything to the tractor at that time.

Hawkins did testify that he did not understand, because it was not explained to him, that if the machine would be raised while he was standing in such a position, his foot were to be in danger. Hawkins further testified that he had seen the posthole digger operate three to four times before, digging the previous holes; that he was familiar with the locking arm; and that Kane should have explained to him that he was not to stand with his foot below the locking arm. Hawkins also testified that he did not understand that the machine would pop back up like it did.

Hawkins further testified that he did not consider it to be dangerous to be standing on the machine while the auger blade was turning. He testified that he did not expect the auger to come up, that he had no reason to know that it would come up, that in all his previous operations with "powerized" posthole diggers, he had never seen one come up like that, and that there is no danger with "motorized" posthole diggers "if you be careful." According to Hawkins, standing on a posthole digger is a safe thing to do. Hawkins also testified that there was nothing unsafe about the work environment. However, in something of a contradiction, Hawkins stated that Kane should have told him "to watch the trip lever on it, if you do get up on top of it." However, he admitted that they both knew the function of the trip lever was to hold "it" up. According to Hawkins, "[Kane] should have told me don't get up on the piece of machinery." However, Hawkins admitted that he got up on it himself and that Kane did not tell him to get on it.

According to Kane:

> We were digging these holes and we started off on a— on a new set of holes up kind of to the top and— and this one wasn't going in. It went in a couple feet and then it quit, and so I pulled it up and put it down, back in to clean the hole out and then it didn't go so I— so, anyway, so it

wasn't going so that's when [Hawkins] got up on there to add more weight to push it down in the hole.

As Hawkins climbed on, Kane held the digger steady "so I didn't raise it up or lower it." Kane, however, did admit that he did not tell Hawkins not to climb on top of the posthole digger. Kane continued:

[Hawkins] was on the posthole digger and for whatever reason that I don't know, it had a tripping mechanism and it tripped, the weight or something had tripped it and he was standing on it and his foot happened to be over the spot where the— where this catch rod comes up and catches the auger so it holds it up in the air. Then his foot happened to be over that and it run— it run it through like that. (Indicating)

Kane was unable to say what "tripped" to cause the digger to "come back to its position" and denied his actions caused the auger to raise. Kane specifically admitted that he had not discussed any sort of safety procedures with Hawkins before using the posthole digger.

The court overruled Hawkins' motion, granted Kane's, and dismissed Hawkins' petition. Although it was never alleged by Hawkins, the court specifically found that there was no defect in the posthole digger. Additionally, the court quoted *Anderson v. Moser*, 169 Neb. 134, 141-42, 98 N.W.2d 703, 708 (1959), for the proposition

"Where a servant of ordinary intelligence and of mature years has operated a simple implement often enough to enable him to avoid being injured by it, when using it in the exercise of ordinary care, or where the mode of operating it is so simple that such a servant can at once perceive the safe and proper way to do so, if exercising ordinary care, there is no duty resting upon the master to instruct him in that regard."

The court then stated, "The plaintiff at the time of the accident was a 31-year-old experienced laborer. His circumstances are not synonymous with those of the 16-year-old tenderfoot in *Grote* [*v. Meyers Land & Cattle Co.*, 240 Neb. 959, 485 N.W.2d 748 (1992)]." We infer from this that the court found that the posthole digger was a "simple implement" and that because

Hawkins was an experienced farm laborer, Kane did not have a duty to warn him of the danger of standing on the digger. Hawkins now appeals.

## ASSIGNMENT OF ERROR
Hawkins contends that the court erred in granting Kane's motion for summary judgment.

## STANDARD OF REVIEW
In reviewing an order granting a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences deducible from the evidence. *Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506, 576 N.W.2d 817 (1998). Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Veskerna v. City of West Point*, 254 Neb. 540, 578 N.W.2d 25 (1998).

## ANALYSIS
The elements of a negligence action are duty, breach, proximate cause, and damages. *Grote, supra*. These four essential elements are matters to be determined by the trier of fact. *Haselhorst v. State*, 240 Neb. 891, 485 N.W.2d 180 (1992).

Initially, we note that farm and ranch hands are not covered under the Nebraska Workers' Compensation Act. Neb. Rev. Stat. § 48-106 (Reissue 1993); *Grote, supra*. An employer is not an insurer of the safety of the appliances which he furnishes, and if the employer exercises the reasonable care which a prudent person would ordinarily take for his or her own safety, under like circumstances, in furnishing his employees with instruments reasonably safe for the particular purpose for which they are used, he has fulfilled his whole duty in that respect. *Lyons v. Wagner*, 185 Neb. 214, 174 N.W.2d 730 (1970) (applying rule to use of farm tractors). In the instant case, Hawkins did

not allege that Kane supplied him with a posthole digger that was defective or not reasonably safe for digging holes in the ground. Instead, Hawkins alleged that Kane failed to warn him of the danger in the manner in which he used the posthole digger—standing on top of the auger gearbox.

It is well settled that a duty rests on an employer to warn his employees of dangers not apparent which may arise in the course of the employment, which the employer knows or ought to know about, and which he has reason to believe the employee does not know and will not discover in time to protect himself or herself. *Grote, supra; Stevens v. Kasik*, 201 Neb. 338, 267 N.W.2d 533 (1978); *Anstine v. Briggs*, 191 Neb. 489, 215 N.W.2d 878 (1974). It is essentially the same duty as that owed to an invitee. *Grote, supra; Anderson v. Moser*, 169 Neb. 134, 98 N.W.2d 703 (1959). See, also, *Heins v. Webster County*, 250 Neb. 750, 552 N.W.2d 51 (1996) (prospectively abrogating classifications of invitee and licensee in favor of standard of care for all those lawfully on premises of another). But, see, *Klawitter v. Lampert*, 248 Neb. 231, 533 N.W.2d 896 (1995) (where aforementioned proposition of law was not required to be given to jury as instruction because danger arose due to method employed by plaintiff). Of course, foreseeability is a factor in establishing a defendant's duty. *Schmidt v. Omaha Pub. Power Dist.*, 245 Neb. 776, 515 N.W.2d 756 (1994). The employer is not compelled to foresee and guard against an accident which reasonable and prudent persons would not expect to happen, and where an injury to an employee could not reasonably have been anticipated, a failure to take precautionary measures is not negligence on the part of the employer for which it is liable to the employee. *Anstine, supra.*

This duty was applied in *Grote v. Meyers Land & Cattle Co.*, 240 Neb. 959, 485 N.W.2d 748 (1992), where the plaintiff was injured when a colt that he was attempting to move at the instruction of one of the defendant's employees kicked him in the head, causing serious injury. The Nebraska Supreme Court sustained a jury verdict for the plaintiff because the evidence reflected that the defendant had failed to warn of the colt's propensity to escape.

■ The exception to this rule, which was used by the trial court and which Kane relies upon on appeal, is that where an employee of ordinary intelligence and of mature years has operated a simple implement often enough to enable him to avoid being injured by it, when using it in the exercise of ordinary care, or where the mode of operating it is so simple that such an employee can at once perceive the safe and proper way to do so, if exercising ordinary care, there is no duty resting upon the employer to instruct him in that regard. *Anderson, supra*; *Brown v. Swift & Co.*, 91 Neb. 532, 136 N.W. 726 (1912).

As stated above, in its order, the court essentially found that the posthole digger was a simple tool or instrument, that Hawkins was an experienced employee, and that as a combination of those two factors, Kane did not have a duty to warn or instruct Hawkins as to its use. In doing so, the court relied on *Anderson, supra*. In *Anderson*, the plaintiff was on the defendant's farm helping the defendant replace a pin into its proper position in a universal joint with a hammer. The plaintiff held the pin while the defendant hit it with the hammer. At some point during the hammering, a particle of metal pierced the plaintiff's eye. The plaintiff then brought a negligence action, claiming that, among other things, the defendant had failed to warn him of the danger and hazard. The court granted the defendant's motion for summary judgment.

■ On appeal, the Nebraska Supreme Court upheld the lower court's decision. In doing so, the court, noting the proposition that one may not be said to be negligent because he fails to make provision against an accident which he could not be reasonably expected to foresee, concluded that there was nothing inherently dangerous about the work, that the mishap was "unforeseeable," and that the hammer was a simple, common tool that "contributed not at all to the injury." *Anderson v. Moser*, 169 Neb. 134, 140, 98 N.W.2d 703, 707 (1959). The court cited to *Vanderpool v. Partridge*, 79 Neb. 165, 112 N.W. 318 (1907) (where plaintiff, who had actual knowledge that chisel which he was using was unsafe and dangerous, was injured when piece of chisel flew into eye, court held that plaintiff had assumed risk), for the proposition that the rule that the

law requires employers to exercise ordinary care to provide reasonably safe tools and appliances for their employees has no application where the employee possesses ordinary intelligence and knowledge, and the tools and appliances furnished are of a simple nature, easily understood, and in which defects can be readily observed by such employee. The court also cited to *Brown, supra* (where court found that two-wheeled meat cart which plaintiff had used all day was simple implement in common use, that mode of handling it was immediately observable to person of ordinary intelligence and of mature age, and that it was intended for single employee to operate collectively relieved plaintiff's employer from duty of giving employee notice of dangers incident to his employment or of instructing him on how to use implement provided for him).

We disagree with the trial court's implicit finding that the posthole digger was a simple tool like the hammer in *Anderson*, the chisel in *Vanderpool*, or the two-wheeled meat cart in *Brown*. Unlike the latter tools, the posthole digger is a complex piece of machinery powered by a motor and operated, at least in part, by the hydraulic controls of the tractor. Indeed, the posthole digger was complex enough that neither Hawkins nor Kane could fully describe the mode of operation of the machine. As an example, when asked to explain what he meant by "it tripped," Kane testified, "I don't— I don't know what I mean. All I know is that it tripped. I can't give you the logistics. . . . Something tripped and made it come back to its position." The descriptions given by Anderson and Ringer were not significantly better. Such lack of understanding, when combined with common sense, dictates that we conclude that the court's application to this case of the proposition of law which relieves an employer from the duty to warn an experienced worker of the dangers of a simple implement was error.

Thus, the question of whether Kane had a duty to warn Hawkins remains. The case *Hirschman v. Maddox*, 223 Neb. 302, 389 N.W.2d 297 (1986), is particularly relevant, though clearly distinguishable from the instant case. In *Hirschman*, the plaintiff, a farmhand, was injured when the rubber straps that he was using to tow a three-wheeled motorcycle around the defendant's farm snapped free. The plaintiff had originally used

baling wire to attach the motorcycle but switched to rubber straps at the suggestion of the defendant. The plaintiff then brought a suit against the defendant, alleging that he was negligent in failing to warn, failing to supervise, and failing to provide a safe place to work. The defendant affirmatively alleged that the plaintiff's negligence barred his recovery and that he had assumed the risk of his actions. The trial court granted the defendant's motion for summary judgment. On appeal, the Nebraska Supreme Court affirmed because the plaintiff's own testimony revealed that he knew that the straps were made of rubber and might snap back if he did not handle them carefully.

In *Hirschman, supra*, the facts were undisputed; significantly, the plaintiff knew of the danger of the equipment with which he was working. That is not the case here. As documented above, the evidence is contradictory as to whether Hawkins knew of the danger of standing on the posthole digger. The testimony of the parties reveals a dispute as to the mode of operation of the posthole digger. While the owner of the digger testified that only the trip lever on the auger could cause "the auger unit to spring back into a locked position after it has dug a hole to the appropriate depth" and that the tractor's hydraulic controls could not lift the auger while it was engaged, both Hawkins and Kane testified that they had been lifting the digger with the three-point hitch on the tractor. Clearly, had the evidence been undisputed that Hawkins knew that tripping the lever on the auger gearbox caused the auger to spring back into its original position, Kane would not have had a duty to warn him.

However, the evidence viewed most favorably to Hawkins creates a genuine issue of material fact as to whether Hawkins knew of the effects of tripping the lever on the gearbox. Hawkins testified that he did not know that the auger could spring back into its original upright position without being tripped by the three-point hitch on the tractor. Hawkins additionally testified that the lever on the auger did not raise the auger blade and that with all of the posthole diggers that he had used over his 20 to 21 years in farming, the auger was raised and lowered by a three-point hitch. The testimony of both Hawkins and Kane reveals that they had been lifting the auger out of the holes by using the three-point hitch on the tractor. It

is a fair inference from Hawkins' testimony that he did not know that the auger could be lifted out of a hole other than by use of the three-point hitch and further that he did not know that the lever on the auger gearbox, which he knew released the auger into the ground and locked the auger into its original position, could also be tripped to cause the auger to spring back into its original position.

Ringer's affidavit further reveals that Ringer showed Kane how to use the "trip lever on the auger." It is a reasonable inference from such testimony that Kane therefore knew that if the lever on the auger were to be tripped, a person standing on top thereof could trip the lever and therefore be in danger of being injured by the locking bar. A further rational inference is that when Hawkins climbed on top of the auger gearbox, Kane should have had reason to believe that Hawkins did not know of the possibility of that danger. As a procedural equivalent to a trial, a summary judgment is an extreme remedy because a summary judgment may dispose of a crucial question in litigation, or the litigation itself, and may thereby deny a trial to the party against whom the motion for summary judgment is directed. *Oliver v. Clark*, 248 Neb. 631, 537 N.W.2d 635 (1995). Viewed in the light most favorable to Hawkins, we conclude that the evidence creates genuine issues of material fact as to whether Kane owed a duty to warn Hawkins, thus precluding summary judgment.

In his answer, Kane affirmatively alleged that Hawkins was barred from recovery due to his own negligence and because he assumed any risk. The determination of whether conduct constitutes contributory negligence is generally a question of fact, *Fetty v. Seward Cty. Rural Pub. Power Dist.*, 238 Neb. 672, 471 N.W.2d 756 (1991), as is assumption of risk, see *Talle v. Nebraska Dept. of Soc. Servs.*, 249 Neb. 20, 541 N.W.2d 30 (1995). An employee is chargeable with contributory negligence where he fails to take due care to avoid defects and dangers which are so open and obvious that anyone in the exercise of ordinary care and prudence would discover them. *Stevens v. Kasik*, 201 Neb. 338, 267 N.W.2d 533 (1978). As a general rule, where the employee has actual knowledge of the dangers to which the service exposes him or where the defects or dangers

are so patent and obvious that in the exercise of ordinary care, in the performance of the services for which he was employed, he should have known of their existence, he assumes the risk of injury incident thereto. *Stevens, supra*; *Gamble v. Gamble*, 171 Neb. 826, 108 N.W.2d 92 (1961); *Ring v. Kruse*, 158 Neb. 1, 62 N.W.2d 279 (1954).

Under the current standard, to obtain summary judgment on the issue of contributory negligence, the defendant has the burden to prove, under the facts viewed most favorably to the plaintiff, that the contributory negligence of the plaintiff is equal to or greater than the negligence of the defendant as a matter of law. Neb. Rev. Stat. § 25-21,185.09 (Reissue 1995); *Dutton v. Travis*, 4 Neb. App. 875, 551 N.W.2d 759 (1996). As discussed above, the facts viewed in the light most favorable to Hawkins reveal that he did not know about the possibility of the auger's springing back into place. While contributory negligence and assumption of the risk will probably remain issues in this case, given the facts before us, we cannot say that they have been established as a matter of law by Hawkins' conduct. Such determinations, in this case, cannot be conclusively made on a motion for summary judgment.

### CONCLUSION

We conclude that there are genuine issues of material fact which preclude summary judgment. As a result, the judgment of the district court is reversed.

REVERSED.