YOUNKER BROTHERS, INC., APPELLEE, V. WESTROADS, INC., APPELLANT.

241 N. W. 2d 679

Filed May 12, 1976. No. 40373.

John W. Delehant of Delehant, Croker & Huck, for appellant.

Joseph Polack of Morsman, Fike, Davis & Polack, for appellee.

Heard before WHITE, C. J., SPENCER, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ., and KUNS, Retired District Judge.

CLINTON, J.

This action, insofar as is pertinent on the appeal to this court, is for a declaratory judgment to construe certain provisions of a shopping center lease defining the obligations of the tenant-appellee, Younker Brothers, Inc., to pay to landlord-appellant, Westroads, Inc., the costs of heating, ventilating, and air conditioning the "demised premises," and the tenant's pro rata share of the same costs for the "common areas," such as an enclosed mall. The costs above mentioned will hereafter be referred to as HVAC and, where necessary to distinguish between those applicable to the demised premises and those applicable to common areas, will be modified by the terms "in-store" and "common area," re-

spectively. The specific question involved here is whether, under the terms of the lease, there was to be included in the HVAC costs or charges elements for depreciation of a central heating and air conditioning plant and for interest on the equity or borrowed capital invested in that central plant. The trial court found that these elements were not includable. Westroads, Inc., appeals. We affirm.

The lease in question was executed by the parties on May 20, 1963. At that time the shopping center had not been constructed and the plans for it had not yet been developed. The lessor, Westroads, Inc., had previously been incorporated by John A. Wiebe for the purpose of developing the shopping center. Pursuant to solicitation by Wiebe, Younkers became a party to the financing of the center by lending the equity capital and also became a key tenant by execution of the lease.

Among many other detailed provisions, the lease covered the following: It demised "A completed store unit having at least one hundred fifty thousand (150,000) gross square feet to be constructed by Landlord at Landlord's cost and expense as hereinafter provided in the location designated 'K' on the leasing plans . . . attached to this lease and made a part hereof." It provided that the store unit "hereinafter referred to as the 'demised premises' is to be part of a shopping center development to be known as WESTROADS." The lease, of course, prescribed the term of the lease, the rent to be paid, and a means for determining the beginning of the term. It also provided that the landlord would construct parking, drives, walking, and service areas.

The lease contained the following provisions relating to common area HVAC: "6. Common areas shall be operated and maintained as follows: . . . ." It then defined common areas in general terms and provided: "As used herein 'common area costs' shall refer to the actual and reasonable cost of operating and maintaining the common areas as hereinafter more particularly pro-

vided." It further provided that, unless relieved under paragraph (F), the landlord should be responsible for operating and maintaining the common areas "subject to payment by Tenant (in addition to rent) of a proportionate share of the common area costs. Tenant's proportionate share of these costs shall be based on the relation that the total floor area of Tenant's store unit bears to the total rented floor area of all buildings in the shopping center. Tenant shall pay its proportionate share of common area costs within thirty days after receiving a statement thereof certified by Landlord to be true and correct but Landlord shall not render such statements to Tenant more often than once a month." The lease then went on to describe in specific and general terms common area costs, and specified certain exclusions therefrom. It then contained an exclusion from the exclusions as follows: ". . . provided that this subparagraph (3) shall not apply with respect to heating or cooling of nonrentable mall space should the shopping center common area include a mall." It also provided: "(E) Notwithstanding the foregoing, responsibility for operation and maintenance of common areas shall be solely that of Landlord (or of the merchants association should an agreement be reached as permitted under paragraph (F) below) and neither Tenant's agreement to contribute to the cost thereof, as hereinbefore provided in this section, nor any other provision of this lease shall be construed to constitute Tenant as in any way a principal, agent, partner or joint venturer in connection with the operation or maintenance of the common areas.

"(F) A merchants association, if formed, shall have the option to take over the operation of the common areas of the shopping center and relieve Landlord of responsibility therefor if and when such association submits to Landlord an enforceable agreement for a term of not less than five years between the merchants association and the individual tenants in said shopping center adequate, in the opinions of Landlord and Ten-

ant, to enforce collection of the expenses of the operation thereof."

Provisions related to in-store HVAC were as follows: "15.   Landlord shall furnish necessary mains and conduits, as set forth in the Plans, in order that hot and cold water, electricity, gas, telephone service and heat may be furnished to the demised premises.   Tenant shall pay for all water, electricity, gas, telephone, and heat used in the demised premises.   Although Landlord shall provide the air conditioning equipment specified in the Plans, Tenant shall pay for this service on a time clock or metered basis."

Section 13 of the lease defined the respective duties of the landlord and tenant with respect to repairs and maintenance of the "demised premises."   We will note details of this provision as necessary later in the opinion.

Incorporated in the lease were certain schedules.   In one of these, under the subheading of "Basic Building," was included the following:   "6.   The following utilities will be installed and measured or metered to the individual tenants:   (a) Heat.   (b) Electric current.   (c) Cold water.   (d) Air conditioning."   In another incorporated schedule, under the heading "Interior Work," was the following:   "5.   Air Conditioning:   (a) A system to suit the normal operation requirements of Tenant shall be provided."   Then under subsection (b) were described certain performance criteria which the air conditioning system must meet.

The lease provided that the landlord should from time to time consult with the tenant as to details of construction as they affected suitability of the building for tenant's use, that working drawings would be submitted for suggestions by the tenant, and that careful consideration should be given to the tenant's suggestions.   The paragraph containing these provisions also provided: "All said construction shall be solely at Landlord's cost and expense, except only as in said schedules Tenant specifically assumes responsibility for some expense; it

being intended that, except for items as to which Tenant so specifically assumes responsibility, Landlord shall deliver a 'turn key' building job ready for occupancy and use by Tenant without expense to Tenant with respect to building."

Plans were presented to the tenant and approved by it on March 16, 1967, by letter in the following form: "In the original lease between Westroads, Inc., Landlord, and Younker Brothers, Inc., Tenant, dated May 20, 1963, on page 3 it is stated:

" 'All said construction shall be at Landlord's cost and expense, except only as in said schedules Tenant specifically assumes responsibility for some expense; it being intended that, except for items to which Tenant so specifically assumes responsibility, Landlord shall deliver a 'turn key' building job ready for occupancy and use by Tenant with respect to building.'

"As plans were developed, certain items of expense were specifically assumed by Tenant such as changes in air conditioning due to including a Beauty Salon in the Kilpatrick store, and increasing the width of the escalators. In addition, some expense relating to electrical work was also agreed to by Tenant. We are assuming that all items where there were changes from the original plans have now been resolved.

"Therefore, we are approving the building plans for Kilpatrick's at Westroads on the condition that Kilpatrick's will not pay for any items of building improvements or construction other than those to which we have already agreed."

The plans which were approved indicated that heat and air conditioning were to be provided by fan-coil units. One familiar with such matters would know that such units are not self-contained and that to be usable a central plant of some kind would be required to heat and chill water and to pump the water through the systems in their respective pipes and coils. No central plant was shown on the plans of the demised premises.

When the first bill for HVAC costs was submitted by Westroads to Younkers for payment on April 11, 1968, it included depreciation and interest on the central energy plant which had been constructed. Later, on July 3, 1968, the elements of cost were specifically broken down on a schedule furnished to Younkers. Younkers refused to pay the parts of cost attributable to depreciation and interest and that issue became part of the present litigation.

The parties have presented their positions to this court in concise and lucid briefs and we state their respective positions in part by quoting therefrom. Westroads, Inc., states: "Schedule III (3) and (5) of the lease require that the heating, ventilating and cooling system (HVAC herein) should, when energized, be capable of meeting certain performance specifications. Westroads could have satisfied those specs by installing package furnaces and coolers wholly in-house. These package units would be energized by gas and electricity, in which case Younkers would have paid the full costs of energy to the local utility companies. Included in these gas and electric rates are charges for depreciation and return on invested capital (or interest). In addition, Younkers would have been obliged to repair and replace these package units which have an average useful life of only six years.

"Instead of the in-store package units, Westroads installed eleven fan coil heating and cooling units in the Younkers space. Each fan coil unit has a large fan which is energized by electricity, and each unit also has two large coils, one energized by hot water and the other by cold water to produce heating or cooling instantly upon thermostat demand. Younkers purchases the electric energy to run the fans from Omaha Public Power District and thus pays OPPD a rate which includes depreciation of OPPD's central plant and interest or return on capital. Younkers purchases the hot and cold energy (i.e. the heated and chilled water) from the

Westroads central utility plant but refuses to pay a rate which includes the expenses of depreciation and interest or return on the capital invested in the central plant. And that is the nub of this law suit."

It concludes that, since all the expert witnesses testified that in determining cost of utility service "depreciation and interest" are included, therefore the undisputed evidence requires that Westroads' position be adopted. In effect it argues that, since the lease does not specifically provide how cost is to be determined, a reasonable rate is to be paid and that undisputably includes depreciation and interest.

Younkers, on the other hand, argues: "Westroads specifically undertook to provide, at its sole cost and expense, the very items of heating and air conditioning equipment for which it now seeks to be repaid, under the guise of 'depreciation and interest.'" It points to the various lease provisions that we have previously quoted or summarized, in particular that part which provides: "All said construction shall be solely at Landlord's cost and expense, excepting only as" the tenant has assumed responsibility, and "Landlord shall deliver a 'turn key' building job ready for occupancy and use by Tenant without expense to Tenant with respect to building."

The principal question before us is one of law in construing the lease to determine from all its pertinent provisions the intention of the parties with reference to the disputed issue. The only important conflict in the evidence relates to the extent to which the parties had, subsequent to execution of the lease, discussed the components to be included in the utility costs. On that matter we accept what would seem to be the apparent findings of the trial court. The applicable rules of law we must consider are these: A cardinal principle of construction of written instruments is that an interpretation shall be made which will reflect the true intention of the parties. Ely Constr. Co. v. S & S Corp., 184 Neb.

59, 165 N. W. 2d 562. In interpreting a written contract, the meaning of which is in doubt and dispute, the court, in order to determine its meaning, will consider all the facts and circumstances leading up to and attending its execution, and will consider the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. McBride v. Fort Kearney Hotel, Inc., 185 Neb. 518, 176 N. W. 2d 911.

Both parties seem to argue that the lease is perfectly clear and that these clear provisions support their respective positions. Yet, Westroads, Inc., relying upon a utility rate analogy, introduced parol evidence for the purpose of showing that the undefined term "actual cost of operating" as commonly understood includes depreciation and return on investment. Younkers argues that even if the lease is ambiguous it must be interpreted in accordance with the provisions of section 25-1217, R. R. S. 1943, which provides: "When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it," and to make the rules applicable relies upon the history of the negotiations between the parties.

We believe the lease is somewhat ambiguous in the following respects: (1) The elements of the cost in question are not precisely defined in the lease. (2) A latent ambiguity arises when one seeks to apply the concept of "demised premises," i.e., 150,000 square feet of store area, to include HVAC equipment which is partly within and partly without the store area. This is a condition for which the parties did not specifically provide when the lease was drafted.

That the lease requires the landlord to furnish at its cost the HVAC equipment is perfectly clear. It leaves to the discretion of the landlord the particular type of equipment to be furnished so long as it meets the performance criteria prescribed in the lease. The fan-coil units which the landlord elected to install in the demised

premises are not self-contained and complete equipment, that is, they will not function merely by application of an energy source. In order for them to function there must also exist the water heating and chilling equipment and the pumps and appurtenances which circulate and control the flow of hot and cold water. Under the provisions of section 13 of the lease it would appear that the tenant is required, after the expiration of the warranty period, to repair and replace HVAC equipment as necessary. We conclude that under the terms of the lease the portion of the central plant serving the functions above described is part of the HVAC equipment to be furnished at the landlord's cost. With these preliminary observations and conclusions we adopt as our own the analysis of the trial court as set forth in its findings.

The trial judge found as follows: "When the lease was drawn, no final decision had yet been made as to whether or not the HVAC equipment would be installed 'in-house' or in a central plant, or in some combination, nor had any final decision yet been made as to whether or not the building would contain a mall. Those matters were subject to the discretion of the defendant, so long as it met, with regard to HVAC, the in-house specifications of the lease, and so long as the result conformed to the provisions of the lease with regard to assessment and amount of costs, and most particularly paragraph 1 of the lease.

"As the defendant points out, it had an option to install all HVAC equipment in-house, and had it done so, plaintiff would then have been financially responsible for the cost of energy to operate such a system as well as the cost of operating expenses, repair, maintenance, and necessary replacement of operating units within such a system (subject only to the one-year guarantee provision). In such a situation, however, it is clear that defendant could not have recovered back from plaintiff, by metering or measuring, its cost of acquiring the nec-

essary equipment or any additional building costs in-
curred as a result of the placement of such equipment.
And it is even more clear, in light of the lease language
'solely at its cost and expense' that the defendant would
not then have been entitled to recover back interest
charges incurred by it in connection with the installa-
tion of such in-house equipment. Defendant did not
have an option of paying cash, or financing and recover-
ing back its financing expense.

"The foregoing discussion appears, on its face at least,
to be pointless since the defendant did, in fact, ultimately
install a central plant system. (It is noteworthy here
to consider that, while a central plant is of substantially
greater utility, the defendant was, in reaching this de-
cision, concerned with its relationships with other ex-
isting or future tenants.) It is not pointless, however,
in view of the provisions of paragraph 1 of the lease
which provide that: (a) the basic building should pro-
vide for heat and air conditioning, (b) that that heat and
air conditioning should meet certain standards, (c) that
substantial variations from the standards and specifica-
tions should be subject to plaintiff's written approval,
(d) that plaintiff's authority to recommend was limited
by a prohibition against materially increased structure
costs, (e) that the cost and expense of providing in-
house HVAC equipment was to be solely that of the de-
fendant except only as the plaintiff might assume some
expense (as it did with regard to the sprinkler equip-
ment), and (f) that subject to that exception the prem-
ises should ultimately be delivered to plaintiff without
expense for building.

"It must be kept in mind that the relationship involved
herein is that of landlord and tenant, with the furnishing
of HVAC by defendant being only incidental to that re-
lationship. It is generally to be expected that a landlord
will recover its costs and obtain its profits from the rent
received, whereas a utility will recover them from the
rate charged. The phrase 'on a time clock or metered

basis' in paragraph 15 of the lease lends nothing to the solution of assistance to defendant, for a time clock or meter provides only a measure of the volume of operation, any variance being in the rate to be applied. Defendant does not, in the central plant, manufacture or produce, but only changes the form of, energy.

"The court concludes, therefore, that the express provisions of the lease require that, with regard to in-house HVAC charges to be paid defendant by plaintiff, nothing is to be included on account of initial acquisition charges incurred by defendant in connection with HVAC equipment or the central plant building, whether construction costs, purchase price, interest, depreciation, or otherwise. What plaintiff is to be charged, and is required to pay, is its proportion of reasonable and necessary costs as incurred for operation, maintenance, repair and replacement (whether or not a particular replacement cost would ordinarily be considered a capital expenditure) of HVAC equipment, to include the central plant building. . . .

"A similar conclusion is reached with regard to common-area HVAC charges, though the reasons therefor are even more compelling.

"The lease provides that 'common area costs shall refer to the actual and reasonable cost of operating and maintaining the common areas'. The insertion of the word 'actual' indicates, at least, an intent to exclude acquisition costs. While 'cost of operation' may, in some contexts, include acquisition costs, it is doubtful if 'actual cost of operating' can be so construed. If 'cost of operating' were intended to include acquisition costs, then the words 'and maintaining' become useless surplusage; for if cost of operating includes one, then it likewise includes the other. Construction, operation, and maintenance are a trilogy in normal usage. The use of the term operation to include construction, is not, at least in the context of this case, to be inferred.

"Subparagraph 12(F) of the lease contemplates the

possibility of a merchants association with an option to take over the operation of the common area and to enforce collection of the expenses of operation thereof. Obviously, the parties did not intend that such an association should collect from the various tenants the defendant's acquisition costs, else there would be a provision for turning such funds over to the defendant.

"If common-area costs were intended to include HVAC acquisition costs, then it would logically follow that they were intended to include all common-area acquisition costs, but that is clearly not the case.

"Finally, one might reasonably expect that, had the parties not intended to apply similar charges for in-house and common-area HVAC they would have used language clearly indicative of such an intent. Thus the conclusion with regard to common-area charges supports that reached with regard to in-house charges."

We should take note of one further argument made by Westroads, Inc. In its brief it says: "Younkers will argue that the rent it pays should somehow be construed to cover the cost of the utility plant, but the rent is defined as 'rent for said premises' (Sec. 5 of lease) and said 'premises' are defined as the demised premises, to wit: 'a completed store unit having at least 150,000 gross square feet to be constructed by Landlord at Landlord's cost and expenses . . . hereinafter referred to as the demised premises. . . .' (Page 1 of lease) The central plant is not even in close proximity to the Younkers store and could not be considered part of the 'demised premises.' " It is clear that the plaintiff concedes that if self-contained in-house and common area HVAC equipment had been supplied the landlord's return thereon would have been obtained through rent. Even though common areas are not part of the "demised premises," the rent paid by the lessee provided the lessor's return on its investment in those areas. Obviously the rent paid for more than just the "demised premises." The record indicates that the landlord had a substantial part

in drafting the final lease. It was likewise clear that it controlled the alternatives as to the type of HVAC equipment which it would furnish. If the construction of a central plant required some reimbursement and return to the landlord over and above rent, this possibility could have been provided for by appropriate language in the lease.

AFFIRMED.