IN RE ESTATE OF FLORENCE MILLER CORBETT,
DECEASED.
WILLIAM DEVRIES ET AL., APPELLANTS, V.
MARIA HAMMANG ET AL., APPELLEES.
318 N.W.2d 720

Filed April 23, 1982. No. 43986.

Ginsburg, Rosenberg, Ginsburg, Cathcart, Curry & Gordon, for appellants.

Ray C. Simmons of Ray C. Simmons, P.C., for appellees Hammang and Canino.

Brian Schmid of Schmid, Ford, Mooney & Frederick, for appellee Rix.

Heard before BOSLAUGH, MCCOWN, and HASTINGS,

JJ., and QUIST, D.J., and RONIN, D.J., Retired.

BOSLAUGH, J.

Florence Miller Corbett died testate on July 21, 1977. Her will dated March 31, 1975, was admitted to probate in the county court of Dodge County, Nebraska, on August 22, 1977. On September 20, 1977, a motion to vacate the order admitting the will to probate was filed by William DeVries, a nephew of the deceased. Later, a codicil dated December 22, 1976, was admitted to probate. In *DeVries v. Rix,* 203 Neb. 392, 279 N.W.2d 89 (1979), we held that the contestant was entitled to be heard upon the motion and remanded the cause to the District Court for a new trial.

A petition for formal probate of the will and codicil was filed in the District Court on April 29, 1980, by Elmer Rix, Maria Hammang, and Rita Bolanos Canino, devisees and legatees under the will and codicil. The contestant and intervenors filed an answer alleging that the deceased lacked testamentary capacity and was under undue influence at the time the will and codicil were executed. The jury found that the deceased had testamentary capacity at the time the will and codicil were executed and that the will and codicil were not the product of undue influence. The contestant and intervenors have appealed. The assignments of error relate to the sufficiency of the evidence to sustain the judgment and the instructions to the jury.

The record shows that the deceased was survived by two sisters, Eva Grimes and Alice DeVries, five nephews, and one grandnephew. A prior will dated October 17, 1969, and codicils dated April 19, 1971, and May 1, 1974, divided the property between the two sisters, with the nephews and grandnephew as residuary legatees.

The will in question left the bulk of the estate to Elmer Rix, a tenant on the farm of the deceased,

and to Maria Hammang and Rita Bolanos Canino, two housekeeper-companions who had cared for the deceased since 1971. The will devised approximately one-half of the real estate to Rix and the rest to Maria. Rita received all of the testatrix' stocks and bonds. The will also made bequests to the two sisters and Donald DeVries, a nephew and intervenor; forgave a $20,000 debt owed to the deceased by the contestant William DeVries; and made a small bequest to Father Muller, the minister of the church of the deceased. The other nephews and the grandnephew received nothing under the will. The codicil gave one-half the contents of the house to Rita.

It is undisputed that the deceased had a slight stroke in 1966 and a more severe stroke in 1970. In 1972 she had a heart attack, after which she was confined to a wheelchair until she died on July 21, 1977. Maria and Rita began providing nursing assistance to the testatrix in 1971, and continued to work for her in that capacity until she died in 1977. Elmer Rix had farmed the testatrix' land since 1939, when the land had belonged to her mother. After the testatrix inherited the land, he continued to farm for her until her death.

Maria Hammang's husband, Warren, helped the testatrix manage her farm in 1974 and 1975. He testified that in March of 1975, at the request of the testatrix, he helped her make a list of her property with notations as to who would receive the property. He testified "she told me what she wanted done." He then typed the list and returned it to her. The testatrix then called her attorney, A. C. Sidner, to her home and asked him to draft a new will according to the list. The attorney dictated a memorandum for the file, which was received in evidence, which stated that he had discussed the provisions of the new will with the testatrix and reminded her that she was "disposing of most of her property outside of the family and it was probable that some of the

family would resent what she was doing. She stated she was aware of all of this, but each of her sisters had as much as she did and were well able to give to their own families. That Maria and her sister had been so kind to her and would stay with her and take care of her. . . . She again stated that the girls [Maria and Rita] had been so kind to her and she had a great aversion to ever going to a rest home and that this way she was assuring herself of care for the remainder of her life." The 1975 will was witnessed by Sidner and Dr. Merrick, the physician who had cared for the deceased. The codicil was drafted by Neil W. Schilke, a partner of her original attorney who was then deceased. It was witnessed by Schilke and G. Michael Wiseman, another partner in the firm.

Dr. Merrick testified at the trial that he was of the opinion that the deceased had testamentary capacity at the time of the execution of the will. Schilke and Wiseman testified that they believed the testatrix had testamentary capacity at the time the codicil was executed. The memorandum prepared by Sidner stated that the testatrix was "in good spirits and very alert" at the time the will was executed. It further stated that he had "asked [testatrix] if anyone was 'twisting her arm' and she laughed and said no, this was her idea."

The contestant nephews, most of whom lived quite far away from the testatrix and none of whom had spent much time with her around the time of the execution of the will and codicil, testified that they thought the testatrix did not have testamentary capacity at the time in question, based mainly on the opinion that the testatrix had begun to "slip" mentally as early as 1973. Mrs. DeVries and two of her acquaintances from Lincoln testified to the same effect. However, a number of witnesses from Fremont and the surrounding area, both friends and business acquaintances of the testatrix, testified to

numerous contacts with her around the time of the execution of the will and codicil. Practically without exception, they testified that, although her speech was slightly slurred from the 1970 stroke and she was somewhat hard of hearing, they were of the opinion that the testatrix understood them when they talked to her, that they could understand her, and that she had testamentary capacity at the proper times.

All of the witnesses who had knowledge testified that Maria and Rita were very good to the testatrix and took excellent care of her. A number of witnesses also testified that it was obvious the testatrix was extremely fond of both Maria and Rita, and also that she got along well with Elmer Rix and respected his farming ability. Only the testatrix' sister, Mrs. DeVries, ventured an opinion that Maria and Rita were exercising influence on the testatrix, basing her opinion largely upon observations that Maria and Rita would occasionally hug the testatrix, pat her hand, or kiss her cheek.

The evidence, although in conflict, clearly was sufficient to sustain the finding by the jury that the deceased had testamentary capacity at the time she executed the will and codicil, and that the will and codicil were not the result of undue influence.

Much of the appellants' argument is devoted to a theory that the will was executed under a mistake of fact because the testatrix believed she would avoid going to a nursing home by leaving the bulk of her property to Maria and Rita. This theory finds little or no support in the evidence.

There is evidence that the deceased did not want to go to a nursing home and wished to be cared for in her own home. There is no evidence of an agreement between the deceased and Maria and Rita by which the latter agreed to care for the deceased, or that the deceased believed such an agreement existed. The evidence does show that the deceased

wanted Maria and Rita to continue to care for her and hoped she would be able to stay in her own home during the balance of her life. Instruction Nos. 5 and 6 requested by the contestants related to the theory of mistake as to an agreement and were properly refused. The substance of requested instruction No. 4 was included in instruction No. 17 given by the trial court. There was no error in refusing to give requested instruction Nos. 4, 5, and 6.

After the jury had commenced deliberations, a written message was sent to the trial court requesting an "[e]xplanation of 'that there was a disposition to exercise undue influence,' " a phrase used in instruction No. 18, which enumerated the elements of undue influence.

Without notifying counsel, the trial court sent a written reply to the jury, stating: " 'Disposition' as used in this context, means an attitude; a mental inclination; or a willingness." The contestants contend this amounted to an instruction given outside the presence of counsel in violation of Neb. Rev. Stat. § 25-1116 (Reissue 1979). The statute requires further instructions to be given in open court "in the presence of or after notice to the parties or their counsel."

*Taulborg v. Andresen,* 119 Neb. 273, 279, 228 N.W. 528, 531 (1930), states: "If it becomes necessary to give further instructions to a jury while it is deliberating, the proper practice is to call the jury into open court and to give any additional instructions in writing in the presence of the parties or their counsel." In *Barry v. Moore,* 172 Neb. 57, 108 N.W.2d 401 (1961), we said: "It is error to give an instruction to a jury after it has retired to deliberate out of the presence of the parties and their counsel, but if it clearly appears that prejudice did not and could not flow therefrom, this is error without prejudice and not ground for reversal." (Syllabus of the court.) See, also, *Breiner v. Olson,* 195 Neb. 120, 237 N.W.2d 118 (1975).

The appellants argue they were prejudiced because the failure to notify counsel deprived them of the opportunity to argue for a preferred "explanation" of the term the jury questioned, and an opportunity to resubmit requested instruction Nos. 4, 5, and 6 to the court. Appellants fail to show what other definition they would have submitted instead of that given by the trial court.

The jury asked for an "[e]xplanation of 'that there was a disposition to exercise undue influence.' " Appellants argue the jury could have been asking for an explanation of the entire phrase, including the term "undue influence." Since "undue influence" was defined in instruction No. 17, it would appear the jury was asking for a definition of the term "disposition" as used in the context of the phrase "disposition to exercise undue influence." The trial court's written reply gave a definition of "disposition" very similar to that appearing in Black's Law Dictionary 558 (4th ed. 1968), which defines disposition as "an attitude; a willingness." Further, in *Holman v. Morrison,* 186 Neb. 159, 181 N.W.2d 441 (1970), the acts of the proponent which the court found demonstrated a "disposition" to exercise undue influence showed a willingness and an attitude on the proponent's part to influence the testatrix. Indeed, the very case which appellants cite in their brief states that "disposition . . . implies a willingness to do something wrong or unfair." *Estate of Phillips,* 15 Wis. 2d 226, 232, 112 N.W.2d 591, 595 (1961). Thus, it appears that the answer given by the trial court to the jury was correct.

Appellants argue they would have resubmitted requested instruction Nos. 4, 5, and 6, all of which purport to define and elaborate upon the term "undue influence" but contain no definition of "disposition." The trial court's instructions had already defined "undue influence" adequately, and the requested instructions would not have provided a different or

better answer to the jury's request. Although the failure to notify counsel and instruct the jury in open court was error, appellants have failed to show they were prejudiced. It furnishes no basis for reversing the judgment in this case.

There being no prejudicial error, the judgment is affirmed.

AFFIRMED.