NEBRASKA DEPOSITORY INSTITUTION GUARANTY CORPORATION, A NEBRASKA CORPORATION, APPELLEE, V. FRANCIS L. STASTNY ET AL., DEFENDANTS AND THIRD-PARTY PLAINTIFFS, APPELLANTS AND CROSS-APPELLEES, THE HARTFORD ACCIDENT AND INDEMNITY COMPANY AND STATE OF NEBRASKA, DEPARTMENT OF BANKING, THIRD-PARTY DEFENDANTS, APPELLEES, AND FIRST STATE BANK OF DWIGHT, THIRD-PARTY DEFENDANT, APPELLEE AND CROSS-APPELLANT.

497 N.W.2d 657

Filed March 26, 1993.   No. S-89-1420.

George H. Moyer, Jr., of Moyer, Moyer, Egley, Fullner & Warnemunde, for appellants.

Thomas M. Locher and Kevin J. Dostal, of Hansen, Engles & Locher, P.C., for appellee First State Bank of Dwight.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

In December 1982, the Dwight Cooperative Credit Association (Association), facing insolvency, merged with the Farmer's State Bank of Dwight, now known as the First State Bank of Dwight (Bank), the third-party codefendant and sole appellee involved in this appeal. To keep the Association operating during 1982, the Nebraska Depository Institution Guaranty Corporation (NDIGC) had deposited a total of $210,000 in a correspondent bank to the credit of the Association. The $210,000 was made available through two promissory notes signed by the third-party plaintiffs-appellants.

The appellants are 12 individuals who were formerly directors, officers, or members of the supervisory committee, membership committee, or the loan committee of the Association. Originally, Raymond Sisel was a third-party plaintiff to this action, but he passed away while the case was at trial and the action was not revived as to him.

After the merger between the Association and the Bank, the promissory notes were not repaid. The NDIGC filed suit against appellants as makers of the notes. Appellants in turn filed third-party claims against (1) the Bank, based on a breach of the merger agreement; (2) the Hartford Accident and Indemnity Company, as the insurer of a fidelity bond on an employee who had embezzled from the Association; and (3) the State of Nebraska, Department of Banking (department), as receiver of the Association's assets and as successor in interest for the NDIGC. The third-party suit against the Bank was severed from the other actions, and a compromise and settlement was reached among the other parties in February 1986. As part of the compromise and settlement, appellants agreed to pay $90,000 in full and complete satisfaction of all sums due to the NDIGC arising from the execution of the two promissory notes. As a result of the settlement, both the department and the Hartford Accident and Indemnity Company were either released from or satisfied all claims asserted by appellants. Consequently, the NDIGC, the Hartford Accident and Indemnity Company, and the department were dismissed as parties to the suit. Appellants

then sought to recover the $90,000 as damages arising from their claim against the Bank. This claim was based on the Bank's alleged breach of a promise in the merger agreement to assume appellants' liability arising from the notes.

After a jury trial, the appellants' breach of contract action against the Bank was dismissed. Appellants now appeal the dismissal of their action. The Bank cross-appeals, asserting that it was error for the lower court to overrule the Bank's motion for a directed verdict.

A brief review of the function and organization of the Association, as distinguished from a traditional bank, is in order. The Nebraska Department of Banking approved the articles of association for the Association in June 1934. The Association was capitalized by a $10 membership fee from each depositor or borrower in addition to an "open share" account that was made up of 10 percent of all members' deposits. Withdrawal from these open share accounts could be restricted by either the Association's board of directors or by an order of the department to protect the interests of the other shareholders.

Amended bylaws approved in 1945 provided, in pertinent part, that "losses incurred by the association should be charged to the guaranty fund, after the board of directors and the supervisory committee jointly determine that a loan or account is uncollectible and that a loss has been incurred, or if so ordered by the department of banking" (article XVI, § 2), and that "[t]here shall be no liability of the members for the debts and obligations of the association" (article XVIII, § I).

Department regulations prohibited cooperative credit associations from carrying overdrafts on depositors' accounts. Therefore, under the recommendation of the department, a depository account was set up in the mid-1970's. This account was funded by a note given by the Association's directors to permit the Association to cover occasional overdrafts arising in the normal course of business. This liability account was known as the "D H Special Account" and commonly referred to as the "director's account." The liability was carried on the Association books as a demand deposit account but did not appear on the Association's daily financial statement.

The events leading up to the present lawsuit generally cover a period of 12 months beginning in December 1981. At that time, depositors at the Association complained to the department that they were not receiving their monthly statements. In late January or early February 1982, the department undertook an examination of the Association's records and uncovered a system of embezzlement by an employee of the Association, Susan Urbanek. Urbanek, who is not a party to this action, acted as a combined assistant secretary-treasurer, teller, and bookkeeper.

To conceal her embezzlement, Urbanek removed the records of all depositors with overdrafts to her home. In addition to the fact that there were missing and presumably embezzled funds, the department uncovered hidden overdrafts in customers' accounts, along with manipulated books and records.

After the discovery, appellants met with officials from both the department and the NDIGC. It was determined that the Association could remain in operation if the NDIGC would transfer $120,000 to the National Bank of Commerce (NBC), the Association's correspondent bank in Lincoln, to the credit of the Association, in exchange for promissory notes made payable to the NDIGC. These notes stated that the directors and their spouses, as well as every party who signed the note, jointly and severally promised to pay the note on demand. None of the directors' spouses in fact signed the notes; however, various officers and committeemen had signed the note, in addition to the directors. No corresponding instrument was ever drawn up to establish whether the money was intended as a loan, a capital contribution, a deposit, an investment in return for stock, or a similar agreement between the appellants and the Association. An entry was made on the Association's daily financial statement to reflect the $120,000 as a positive balance in a "director's account."

In June 1982, the appellants signed another note payable to the NDIGC for $90,000 to cover further overdrafts that had surfaced. This money was again deposited in NBC to the credit of the Association and was reflected as an addition to the "director's account."

In December of that year, the department drew up a

statement of assets and liabilities, referred to as exhibit A by the parties and again at trial. This statement reflected the financial condition of the Association as of December 10, 1982. On this statement, an "overdrawn deposit account" in the amount of $128,197.83 appeared as an asset. The "director's account" was reported to have a balance of $142,115.98. On December 16 or 17, 1982, the department declared the "overdrawn deposit account" to be a worthless asset and charged the account against the $142,115.98 amount in the director's account.

On December 20, 1982, the department director informed the appellants that the Association needed an additional $200,000. The appellants refused to sign another promissory note. The department director then stated that he had a buyer for the Association, Kermit Wagner. Counsel for the appellants realized he had a conflict of interest between the potential buyer and appellants, and withdrew his representation at the meeting.

Later that evening the appellants met with Wagner. The following day they obtained new counsel and on December 22, 1982, the parties, in addition to the NDIGC and the department, began negotiating the merger of the Association with what is now known as the Bank. Negotiations concluded on December 23, 1982, and were reduced to writing in a "Memorandum of Agreement to Merge" (merger agreement), signed by the secretary-treasurer of the Association, appellant David Hotovy, by the Bank's president, Kermit Wagner, and by Paul Amen of the department. The statement of assets and liabilities, dated December 10, 1982, was referenced and attached to the merger agreement.

Pertinent provisions in the merger agreement stated that the parties agreed to the following:

1. Association represents that the Statement of Assets and Liabilities prepared by the Nebraska Department of Banking and Finance and attached hereto as Exhibit "A" appears to be a true and correct compilation of the assets and liabilities of Association.

2. Association hereby represents that there are no other liabilities known to the Association other than those represented on Exhibit "A" and ordinary operating expenses paid or incurred subsequent to the date thereof.

3. Association herewith transfers all of the assets and liabilities set forth in Exhibit "A" except the sum of $14,511.98 cash, which shall be held by the Nebraska Department of Banking and Finance.

. . . .

6. Bank hereby assumes and agrees to pay all liabilities set forth in Exhibit "A", including "Share Accounts", shown thereon.

. . . .

8. Bank and the Association hereby acknowledge that there are assets of the Association that are not being transferred as a part of this Memorandum of Agreement and which are not shown on Exhibit "A", which assets shall be held for collection by the Nebraska Department of Banking and Finance.

9. Bank hereby represents and agrees that it will use reasonable efforts in the ordinary course of its banking business to collect on any assets held by the Association after the merger in the possession of the Nebraska Department of Banking and Finance and owing to the Association at date hereof.

Subsequently, the NDIGC sued appellants for payment of the promissory notes. Appellants filed third-party petitions against the Bank, the department, and the Hartford Accident and Indemnity Company (Hartford), the insurer of the fidelity bond against Susan Urbanek. As previously noted, the third-party suit against the Bank was severed from the other actions, and compromise and settlement agreements were reached among the other parties in February 1986. Under these agreements, the NDIGC received $90,000 from appellants, $75,000 plus $25,000 in interest from Hartford on the fidelity bond, and $22,000 from the department (representing the $14,511.98 cash mentioned in paragraph 3 of the merger agreement, the appellant's membership, and open shares and some collected overdrafts). The department assigned to the appellants the uncollected overdrafts from the Association and the anticipated restitution from Urbanek. Appellants continued to pursue their action against the Bank seeking to recover the $90,000 settlement amount as damages.

At trial, the appellants argued that the "director's account" was a liability of the Association which the Bank should have assumed in accordance with paragraph 6 of the merger agreement. This argument was based on the appellants' subjective beliefs, the asserted representations given by the NDIGC and the department, the Association's previous treatment of the "D. H. Special Account" as a liability, and the option of experts that the unique capital structure of a credit association could not reflect any ownership equity from a "capital injection." The appellants further argued that, in accordance with paragraph 3 of the merger agreement, the Bank should have assumed responsibility for the "overdrawn deposit account" in the amount of $128,197.83, which appeared as an asset on the attached statement of assets and liabilities dated December 10, 1992, instead of treating it as a chargeoff against the "director's account."

Conversely, the Bank argued that the "director's account" was a capital injection required by the State banking department, and not a liability. The Bank further maintained that the account was depleted when the department charged off the "overdrawn deposit account" against the "director's account" on December 17, 1982, due to the insolvency of the Association, and that this was reflected in the $14,511.98 reference in paragraph 3 of the merger agreement.

Finding the merger agreement ambiguous, the district court submitted the case to the jury. The jury heard testimony from 26 different witnesses over a 3-week period before the parties rested. During the jury's deliberations, it sent out the following question for the court:

> Must me [sic] judge solely on the basis of wheather [sic] the Directors Account is correctly or incorrectly placed in the Capital Section.
>
> Can we decide on the basis that the contract was misrepresented to the Directors of the Coop at the time of signing, in that Exhibit A, of Memo to Merge still shows the written off loans & overdrafts as assets.

The trial court responded with jury instruction No. 12, which stated:

> Your question submitted to the Court indicates doubt

and dispute with regard to the meaning of "Director's Account." You are instructed that you should consider all facts and circumstances leading up to and attending the execution of Exhibit 1; and consider the relationship of the parties, the nature and situation of the subject matter of the agreement and the purpose of making the contract.

The law provides: When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it.

The jury found in favor of the Bank and against the appellant. Subsequently, appellants brought this appeal, asserting 18 assignments of error. These asserted errors challenge the district court's decision to give or refuse certain jury instructions, to receive the testimony of various witnesses over appellants' objection, and to deny appellants' request for redirect of a witness. The Bank cross-appeals, asserting that the court erred by failing to sustain its motion for a directed verdict.

We first note that the interest of the third-party plaintiff, Raymond J. Sisel, who died after commencement of the trial but prior to judgment, was not revived in the lower court. We find nothing in the record before us to indicate that the appellants or the personal representative of Sisel's estate have sought to assert Sisel's interest in the suit. The appellee does not claim error in proceeding with the case without revivor or substitution. The court clearly acknowledged the death of Sisel in the record in the presence of both parties and their respective counsel. Therefore, we proceed under the assumption that all the parties agree that the action properly progressed under Neb. Rev. Stat. § 25-1403 (Reissue 1989), which allows an action to proceed when one of several plaintiffs dies, if the right of action survives to the remaining parties.

From the outset the parties do not dispute, and we are in agreement with the trial court, that the merger agreement and the statement of assets and liabilities, when construed together, are ambiguous. Among the multiple ambiguities, we note that the contract does not define the term "director's account." The meaning of this term is not known under generally accepted

accounting practices, nor is the meaning ascertainable from the contents of the documents. We also observe that the statement of assets and liabilities does not clearly specify what is a liability and what is a capital account under the right-hand column marked as a whole as "liabilities." Furthermore, paragraph 3 of the merger agreement is obscure in that it refers to the transfer of all assets and liabilities to the Bank except for $14,511.98, without explaining which account this transfer is to be excepted from and without an obvious corresponding amount in any accounts appearing on the attached statement of assets and liabilities.

Appellants' first assignment of error, addressed as the fifth argument in the brief, relates to jury instruction No. 2. This jury instruction assigned the appellants the burden of proving, among other things, that "the plaintiffs [appellants] are entitled to enforce the Memorandum of Agreement, Exhibit 1." Appellants maintain that this instruction was erroneous because it involved the issue of whether a party is the real party in interest, a question of law for the court that should not be submitted to the jury.

We find appellants' interpretation of this instruction untenable. Whether a party is entitled to enforce a contract and whether a party is a real party in interest are not synonymous inquiries. In determining if a party is a real party in interest, the focus of the inquiry is whether the party has standing to sue because the party has some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy. See *Stahmer v. Marsh*, 202 Neb. 281, 275 N.W.2d 64 (1979). The purpose of the inquiry is to determine whether the party has a legally protectable interest or right in the controversy that would benefit by the relief to be granted. *Id*. However, a reasonable interpretation of the jury instruction in question, when read as a whole with the remainder of the jury instructions, was that it asked for a determination of whether appellants could ultimately *enforce* their rights or interests in the contract against the appellee, an issue properly left to the province of the jury when a contract is ambiguous.

Appellants next argue that the court erred by giving, on its

own motion, jury instruction No. 12, in response to the jury's question because the instruction (1) is an incomplete quotation of the rule announced in *Younker Brothers, Inc. v. Westroads, Inc.*, 196 Neb. 168, 241 N.W.2d 679 (1976); (2) is confusing and misleading; and (3) does not respond to the jury's question in that it places disproportionate emphasis on one term of the contract in exhibit 1, that is "director's account," without addressing the jury's inquiry about other representations in exhibit A, the statement of assets and liabilities. In response, the Bank argues in part that appellants failed to properly preserve the issue for appeal.

Under Neb. Rev. Stat. § 25-1116 (Reissue 1989), if a jury has retired for deliberation and desires information as to

> any part of the law arising in the case, they may request the officer to conduct them to the court where the information upon the point of law shall be given, and the court may give its recollection as to the testimony on the point in dispute in the presence of or after notice to the parties or their counsel.

When it becomes necessary for the court to give further instruction to the jury while it is deliberating, the proper practice is to call the jury into open court and to give any additional instructions in writing in the presence of the parties or their counsel. *In re Estate of Corbett*, 211 Neb. 335, 318 N.W.2d 720 (1982); *Breiner v. Olson*, 195 Neb. 120, 237 N.W.2d 118 (1975). The record in this case reveals that the court contacted counsel for the parties by telephone before further instructing the jury. Appellants' counsel asserted at the subsequent hearing on appellants' motion for new trial that he had objected to jury instruction No. 12 in his telephone discussions with the trial court. The trial court's recollection of the two-person conversation was uncertain of appellants' objection, and no record of counsel's objections or consent is available for our review.

Obtaining consent of counsel over the telephone, before giving additional jury instructions outside the presence of the parties or counsel, is potentially troublesome. As illustrated by this case, the failure to obtain the consent of counsel in open court deprived appellants of the opportunity to make and

preserve a proper record of their objections to the written jury instructions. To hold that the appellants waived their objections to the jury instruction in light of the ambiguous nature of the record before us would further discount a substantial right of the appellants. Therefore, we reject the Bank's assertion that appellants failed to timely object to the jury instruction.

A party's right to a fair trial may be substantially impaired by jury instructions that contain incorrect information, suggest an improper shift of the burden of proof, misstate the law upon a vital issue, improperly single out or give undue prominence to particular evidence or facts, contain inconsistencies, or confuse or mislead the jury. See, generally, *Omaha Mining Co. v. First Nat. Bank*, 226 Neb. 743, 415 N.W.2d 111 (1987) (holding that instructions which misstate the issues or defenses and have a tendency to mislead the jury are erroneous); *Juniata Feedyards v. Nuss*, 216 Neb. 29, 342 N.W.2d 1 (1983) (noting that conflicting instructions are generally erroneous and prejudicial); *Hersch Buildings, Inc. v. Steinbrecher*, 198 Neb. 486, 253 N.W.2d 310 (1977) (finding that confusing and inconsistent instructions which concern the burden of proof constitute reversible error); *Knihal v. State*, 150 Neb. 771, 36 N.W.2d 109 (1949) (holding that it is reversible error for the court's charge to the jury to give undue prominence to a portion of the testimony by special reference thereto); *Kleutsch v. Security Mutual Life Ins. Co.*, 72 Neb. 75, 100 N.W. 139 (1904) (holding that it is error for an instruction to single out a particular part of the evidence and express an opinion as to its weight, strength, or probative force).

Jury instruction No. 12 failed to fully address the question proposed by the jury. By partially confronting the jury's inquiry, the court inadvertently emphasized and directed the jury to consider evidence and factual issues relating to the "director's account" in exhibit 1, the merger agreement, while minimizing the express concerns of the jury regarding the equally important attached exhibit A, the statement of assets and liabilities. Jury instruction No. 12 was therefore misleading, confusing, and unduly suggestive of an outcome to the prejudice of the appellants, which requires a reversal and remand for a new trial. Recognizing that the remaining asserted

errors will likely arise again if a new trial is pursued, in the interest of judicial economy we will address the remainder of the parties' claims.

Appellants also allege that the court erred when it refused to give (1) an instruction to determine the intent of the parties when the memorandum of agreement to merge was executed; (2) an instruction about the applicable rules of construction by which the intention of the parties to a written instrument may be discovered; and (3) appellants' instructions numbered 2, 4, 5, 8, and 13, which generally related to the construction and interpretation of the meaning of a contract and its attached documents, as well as the proper measure of damages.

"All jury instructions given must be read together, and if, taken as whole, they correctly state the law, are not misleading, and adequately cover the issues supported by pleadings and evidence, there is no prejudicial error necessitating a reversal." *McClymont v. Morgan*, 238 Neb. 390, 394, 470 N.W.2d 768, 772 (1991). However, the refusal to give proper requested instructions, which are not covered by other instructions which are given, is error. *Kaspar v. Schack*, 195 Neb. 215, 237 N.W.2d 414 (1976). Notwithstanding an absence of a request for a specific instruction, a trial court must instruct the jury on material or relevant issues presented by the pleadings and supported by the evidence. *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988).

The jury instructions that were given addressed a statement of the case, plaintiff's assertions and defendant's denial, burden of proof, effect of findings, and general civil instructions on duties of the jury, statements of counsel, rulings by the court on evidence, jury deliberations, expert witnesses, and the status of a corporate defendant and its agents. At the pretrial conference, both parties to this appeal had requested and offered, but were refused, instructions relating to the construction and interpretation of a contract. In consideration of the court's finding that the written contract was ambiguous as a matter of law, we hold that the court erred in refusing to instruct the jury on the construction and interpretation of an ambiguous contract in consideration of the parties' intentions at the time the contract was executed.

The appellants' next assignments of error revolve around the testimony of two certified public accountants employed by the Bank. The first witness, Mike Lieck, was a Bank employee who had assisted in the merger with the Association and had negotiated with the NDIGC for a separate agreement guaranteeing that the Association's assets would equal its liabilities. To establish that all preconditions had been met, appellants had introduced the NDIGC separate agreement, exhibit 12, as part of the merger agreement because it was referred to in the merger agreement as a condition precedent to the Bank's duty to perform. Later in the trial Lieck gave testimony, over appellants' objections, as to why the negotiations with the NDIGC, at which the appellants were not present, were important to the Bank and whether the Bank considered the "director's account" to be a liability.

The second witness was Frank Connealy, another Bank employee, who assisted with the negotiations with the NDIGC. Connealy was allowed to testify, over appellants' objections, to the weakness of the Association's loan portfolio in relation to the guarantee negotiation with the NDIGC, on how the NDIGC agreement, exhibit 12, was related to the merger agreement, and what the NDIGC was required to do based upon the witness' understanding.

The appellants allege that the court erred in receiving the witnesses' testimony because it (1) included improper mental impressions, conclusions, and opinions as to what the witnesses thought the contract meant; (2) involved negotiations for a separate agreement between the Bank and the NDIGC; (3) related to how the Bank and the NDIGC performed an agreement to which appellants were not a party; and (4) allowed Lieck, who was not named in answers to interrogatories as an expert, to testify to his opinion that the "director's account" was capital of the Association and not a liability.

Conversely, the Bank argues that the testimony in question was properly admissible in that the negotiations with the NDIGC and the witnesses' understanding of the term "director's account" concerned facts and circumstances leading up to and attending the execution of the merger agreement and were offered to assist in the interpretation of the ambiguous

merger agreement. The Bank also counters that Lieck's testimony was not offered as expert testimony, but for the purpose of ascertaining the intention of a party to the merger agreement.

When a contract is ambiguous, the court may consider all facts and circumstances leading up to the contract's execution, the nature and situation of the subject matter, and the apparent purpose of the contract. *Lone Oak Farm Corp. v. Riverside Fertilizer*, 229 Neb. 548, 428 N.W.2d 175 (1988). The testimony of the two witnesses relating to the NDIGC contract was admissible to show facts and circumstances leading up to the execution of the merger agreement, relevant to the Bank's purpose in including a clause in the merger agreement relating to the NDIGC, and permissible parol evidence to aid the jury in the interpretation of an ambiguous contract.

The employee witnesses' opinions as to the intended meaning of the term "director's account" were also admissible. "In interpreting a written contract, the meaning of which is in doubt and dispute, evidence of prior or contemporaneous negotiations or understandings is admissible to discover the meaning which each party had reason to know would be given to the words by the other party." *Quinn v. Godfather's Investments*, 213 Neb. 665, 668-69, 330 N.W.2d 921, 924 (1983). The NDIGC negotiations were contemporaneous with the merger agreement. These negotiations were relevant to the Bank's understanding of the "director's account" in that the Bank necessarily had to determine the value of the Association's assets in comparison to its liabilities in order to arrive at a guarantee amount against the outstanding loans. Therefore, Lieck's understanding that the "director's account" was not a liability was admissible as evidence of a contemporaneous understanding and as parol evidence of the understanding of a party to aid in the construction of an ambiguous contract.

Appellants further allege that it was reversible error for the court to (1) allow the appellants' own witness, Richard Wible, to give an expert opinion he was not qualified for; (2) allow Wible to render an opinion on cross-examination regarding a subject that appellants did not examine on direct; and (3) refuse

to allow appellants to reexamine their own witness, Richard Wible, regarding a subject introduced by appellee on re-cross-examination. We find that the record does not support the first two assertions, while the third asserted error was within the authority of the trial court and will not be disturbed on appeal absent an abuse of discretion.

Wible, an employee of the Association's correspondent bank who had assisted in reconciling the Association records after the overdraft and embezzlement problems surfaced, was extensively questioned by appellants' counsel on direct examination. On redirect, appellants' counsel further questioned Wible about the appearance of the "director's account" on the Association's records. The complained-of testimony on re-cross-examination asked for Wible's opinion as to the nature of the "director's account," as either a liability or a capital account, in relation to Wible's participation in offsetting entries during the review of the Association's records.

It is within the discretion of the trial court to permit subsequent examination of a witness after direct and cross-examination. Considering that appellants introduced the subject of the "director's account" into evidence on redirect examination, the Bank's further inquiry on recross did not introduce a matter foreign to redirect or seek Wible's opinion as an expert. In light of the subject matter of the testimony and the cumulative record before us, we cannot say the trial court abused its discretion in permitting the Bank to further inquire about the witness' direct involvement with the account on recross, and then refuse the appellants further reexamination of the witness.

Appellants' final arguments assert that the court erred by permitting a witness to testify to custom and practice in the banking industry with no foundation and without those matters having been pled, and to testify to prior transactions which did not involve either party to this case.

These assertions relate to the testimony of Janet Labenz, an expert witness called by the Bank. Labenz, a certified public accountant specializing in financial institutions, had experience with four other mergers involving cooperatives and banks. Labenz gave her opinion that the "director's account" was not a

liability of the Association. Over objection, Labenz was allowed to testify that it was not significant to her interpretation of the disputed term that the statement of assets and liabilities dated December 10, 1982, was attached to the merger agreement on December 23, 1982, because

> [i]n the — the acquisitions in which I've participated, it's been the usual practice that some sort of balance sheet has to be looked at to discuss the terms of the negotiation. It's irrelevant what particular date is used in looking at that sample because the actual agreement isn't effective until some subsequent day, in this case, December 24th.
>
> . . . .
>
> I've worked on acquisitions of co-ops by banks and also the conversion of co-ops into banks and in those situations we would typically work with whatever balance sheet was available from the most recent information. So it would not be unusual to look at a balance sheet that was maybe prepared a week or two before the actual closing of the transaction.

Appellants argue that since the Bank failed to plead or allege a special custom as a defense it cannot rely on this testimony. Appellants further maintain that the Bank failed to prove that the appellants, as agents of the Association, had knowledge of the special custom and contracted in reference to it because the witness had no foundation from which to assume that the appellants had knowledge of such a custom or contracted with reference thereto. Therefore, the appellants assert, the testimony was inadmissible because it was evidence of irrelevant transactions neither connected to the transaction before the court nor involved even one of the parties to the suit.

In reply, the Bank argues that the testimony was admissible as that of an expert opinion to assist the trier of fact in understanding the merger agreement and the practices and methods that may have been utilized by the parties in executing the merger agreement. The Bank also contends that Labenz' testimony relating to the "director's account" was based on her experience as a C.P.A., and that the testimony regarding her experience with other mergers went to the weight of her testimony and not to its admissibility.

Admissibility of expert testimony depends on whether specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. It is for the trial court to make the initial decision on whether the testimony will assist the trier of fact. The soundness of its determination depends upon the qualifications of the witness, the nature of the issue on which the opinion is sought, the foundation laid, and the particular facts of the case. *National Bank of Commerce Trust & Sav. Assn. v. Katleman*, 201 Neb. 165, 266 N.W.2d 736 (1978).

Expert testimony as to the custom and practice of an industry is admissible to elucidate the meaning of ambiguous language. *Roca v. Republic Nat. Bank of Miami*, 512 So. 2d 1044 (Fla. App. 1987), *rev'd on other grounds* 534 So. 2d 736 (Fla. App. 1988). When a contract term is not defined in the parties' contract and the parties dispute the intended meaning of the term, an expert witness may properly testify as to the expert's interpretation of the contract language. *Buford v. Wilmington Trust Co.*, 841 F.2d 51 (3d Cir. 1988).

The admission of expert testimony relating to the expert's basis for the interpretation of the term "director's account," as used in the statement of assets and liabilities, was not manifestly erroneous. Although not a generally accepted accounting practice, the term took on a specialized usage and meaning in light of the events surrounding the months before the execution of the merger agreement. When viewed as a whole, the contract is ambiguous; therefore, expert accounting testimony was required to explain the accounting interpretation of the term. Considering that the statement of assets and liabilities and the merger agreement were dated differently, and the opening balance sheet of the Bank attributed·a different amount to the "director's account" than appeared on the statement of assets and liabilities, the witness' testimony was relevant and admissible to resolve this inconsistency as it related to her interpretation of the disputed account.

Both parties presented expert testimony which offered the jury differing views of the term "director's account." Recognizing that the admission of evidence is largely left to the discretion of the trial court, under the circumstances presented

we find that the trial court did not abuse its discretion in admitting this testimony.

The Bank asserts in its cross-appeal that the court should have granted the Bank's motion for a directed verdict at the close of the evidence. The Bank first argues that appellants failed to offer evidence of an express or implied contract to establish that the money in the "director's account" was a liability, such as a deposit or a loan, which the Bank was obliged to assume as part of the merger agreement. Second, the Bank claims that appellants, who were not parties to the execution of the merger agreement or assignees of the Association, failed to establish a contractual basis obliging the Bank to pay any amounts in the "director's account" to them as the beneficiaries of that account.

The party against whom a judgment is sought under a directed verdict is entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference as reasonably deducible from the evidence. *Ditloff v. Otto*, 239 Neb. 377, 476 N.W.2d 675 (1991). If there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. *Horst v. Johnson*, 237 Neb. 155, 465 N.W.2d 461 (1991). "A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom." *Artex, Inc. v. Omaha Edible Oils, Inc.*, 231 Neb. 281, 284, 436 N.W.2d 146, 149 (1989).

The testimony and evidence presented at trial revolved around the sharply disputed issue of whether the "director's account" was a liability or capital account of the Association. Appellants testified to their belief that the money in the "director's account" was a loan or other liability which would be repaid to them. Appellants presented evidence that the former "D H Special Account," which had been treated as a liability owed to the directors since the 1970's, was also known as the "director's account." Expert witnesses for the appellants testified that in their opinion, the "director's account" could only be a liability due to the unique capital structure of a cooperative credit association. Testimony adduced at trial

showed that the money received from the NDIGC on the promissory notes signed by appellants was simultaneously deposited to the credit of the Association and recorded as an entry in the "director's account." The settlement and compromise agreement between the NDIGC, the department, and appellants demonstrated that appellants had in fact been given credit on their notes payable from assets of the Association, such as the remainder of the "director's account" and the money recovered from the fidelity bond.

This evidence and all proper inferences which can reasonably be deduced therefrom are not insufficient as a matter of law so as to justify a directed verdict for the Bank. Appellants presented sufficient evidence to support their theory that the money in the "director's account" was a liability owed to appellants in which appellants had an identifiable right or interest. Where, as here, the evidence is in conflict and such that reasonable minds may draw different conclusions therefrom, it was proper for the trial court to overrule the Bank's motion for a directed verdict.

In sum, based on our findings that the court erred in giving jury instruction No. 12 and in refusing to give requested relevant jury instructions that were not covered by the instructions given, the judgment of the district court is reversed, and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

CAPORALE, J., not participating.